UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                                        :

EVIP CANADA, INC. and TERRACAP VENTURES,  :
INC.,                                                :

                          Plaintiffs,             :               18-cv-11456 (LJL)
                                                :

                     -v-                   :         OPINION AND ORDER
                                                :

SCHNADER HARRISON SEGAL & LEWIS LLP and   :
JOEL HANDEL,                                         :
                                                :

                        Defendants.          :
                                                :
--------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Defendants Schnader Harrison Segal & Lewis LLP ("Schnader Harrison") and Joel

Handel ("Handel," and together, "Defendants") move for summary judgment, pursuant to Fed.

R. Civ. P. 56, on claims brought against them by Plaintiffs EVIP Canada, Inc. ("EVIP") and

Terracap Ventures, Inc. ("Terracap" or "Terracap Ventures," and together, "Plaintiffs").  Dkt.

No. 40.

        For the following reasons, the motion for summary judgment is granted.

BACKGROUND

        This case arises out of Defendants' legal representation of Plaintiffs in connection with

the execution of a joint venture agreement.  Plaintiffs claim that Defendants should have

negotiated for minority rights in connection with the anti-dilution protection of their Series D

Preferred Stock or informed them of their failure to obtain such rights, but failed to do so.

Plaintiffs bring legal malpractice claims against Schnader Harrison and Handel and a breach of

contract claim against Schnader Harrison based allegations that Defendants breached their

obligations in connection with their representation of Plaintiffs in the negotiation of the joint venture agreement.

The following facts are undisputed unless otherwise noted.

## I.   The Transaction

### A.   The Better Place Assets

Plaintiff Terracap is a Canadian corporation in the business of technology-based venture capital investment.  Dkt. No. 41 ¶ 1.  Larry Krauss ("Krauss") is the president and controlling shareholder of Terracap.  *Id.* ¶ 4.  In or around July 2013, Krauss learned of the opportunity to purchase out of an Israeli bankruptcy proceeding the intellectual property and related assets of Better Place, Ltd. (the "Better Place Assets"), a company that produced technology for networking electric vehicles and their battery charging and/or switching stations.  *Id.* ¶ 5. Because Terracap lacked expertise regarding electric vehicles, Terracap sought a joint venture partner to monetize the Better Place Assets.  *Id.* ¶ 6.

In or around July 2013, Terracap began discussions with Brammo, Inc. ("Brammo"), a producer of electric vehicles and related technology, about the possibility of entering into a joint venture to monetize the Better Place Assets (the "Joint Venture").  *Id.* ¶ 7.  Around the same time, EVIP was formed as an affiliate of Terracap and special purpose vehicle whose sole purpose was to make an investment in Brammo as part of the Joint Venture and to hold the ownership interests in the Joint Venture.  *Id.* ¶ 3; Dkt. No. 66 at 2.  EVIP is a Canadian corporation almost entirely owned by Krauss and/or his family (approximately 95%) with the remaining percentage owned by investors.  Dkt. No. 41 ¶ 4; Dkt. No. 66 at 2.  Krauss is EVIP's president.  Dkt. No. 41 ¶ 4.

### B.      The Agreements

#### 1.      MOUs

On or about October 29, 2013, Terracap and Brammo executed a non-binding memorandum of understanding ("October 2013 MOU"). *Id.* ¶ 9; *see* Dkt. No. 43-6. It stated that it was "non-binding and intended to be replaced by a Definitive Agreement" at which time "it is expected and agreed that this MOU will be of no further force or effect upon execution of the Definitive Agreement." Dkt. No. 43-6.

The October 2013 MOU provided that Terracap would acquire the Better Place Assets through a newly formed entity (that would eventually be EVIP), and that EVIP and Brammo then would create the Joint Venture with the purpose of developing and integrating the Better Place Assets with Brammo's expertise. Brammo and EVIP would each own 50% of the Joint Venture. *Id.* ¶ E. As a condition for Brammo consummating the Joint Venture, Terracap would agree to invest at least $5 million in Series C Preferred Stock of Brammo (or find investors for those shares) at a pre-money valuation of $250 million "(or, in the event that a subsequent closing of series C preferred shares occurs after this date of this MOU at a lower value and/or on more favourable terms, the purchase price and/or terms as the case may be will be [sic] revised accordingly.)." *Id.* ¶ F(a). The October 2013 MOU also contemplated that EVIP would receive from Brammo 3,906,250 common shares of Brammo in partial consideration for its contribution of the Better Place Assets to the Joint Venture. *Id.* ¶ G.

On November 6, 2013, Terracap closed its acquisition of $1 million of Series C Preferred Stock of Brammo, leaving $4 million remaining on the commitment under the October 2013 MOU. Dkt. No. 41 ¶ 11.

Six days later, on November 12, 2013, Terracap acquired the Better Place Assets for a net purchase price of $1,864,282. *Id.* ¶ 12; Dkt. No. 65 ¶ 22.

On December 2, 2013, Terracap and Brammo executed a second non-binding memorandum of understanding ("December 2013 MOU").  Dkt. No. 41 ¶ 13; Dkt. No. 43-9.  It also stated that it was non-binding and intended to be replaced by a final agreement.  Dkt. No. 43-9.

Similar to the October 2013 MOU, the December 2013 MOU provided that EVIP and Brammo would create the Joint Venture with the proposed ownership split of 50% and 50%, but added that the ownership split would be "subject to ESOP and dilution."  *Id.* ¶ E.  It still required Terracap to invest at least $5 million in the current round of financing in Series C Preferred Stock, but now at a reduced pre-money valuation of $215 million, reflecting the lower valuation of the business.  It further added, "Terms will include full ratchet anti-dilution protection for the remainder of the C round, and weighted average protection thereafter."  *Id.* ¶ F.  It also noted that "$1 million of this investment has already occurred by way of an equity investment and will be adjusted to the revised share price."  *Id.*  Finally, it noted that in consideration for its 50% of the Joint Venture, Brammo would pay 4,545,455 common shares of Brammo to EVIP, but "in the event that a subsequent closing of series C preferred shares occurs after this date of this MOU at a lower value, the number of shares paid [to EVIP] will be adjusted accordingly" and "[a]fter closing of the C round the shares will received weighted average anti-dilution."  *Id.* ¶ G(b).

## 2.    Joint Venture Agreement

On February 14, 2014, EVIP and a Brammo affiliate, Brammo EV Network Inc. ("Brammo EV"), formed the joint venture entity B-Con Technologies Ltd. (the joint venture entity, "B-Con") and executed a shareholders' agreement with it (the "Joint Venture Agreement"), which set forth the terms concerning the management and operation of the Joint Venture and the investment by EVIP in Brammo.  Dkt. No. 41 ¶ 14; *see* Dkt. No. 43-2.  Don

McDougall ("McDougall"), the former vice president of investments and asset management at Terracap, signed the agreement "on behalf of" Krauss as president of EVIP.

The Joint Venture Agreement contemplated that Brammo would issue no fewer than 26 million shares of a new Series D Preferred Stock and that EVIP would have only a minority position in that class of security. The Joint Venture Agreement required EVIP to purchase 6 million shares of a new Series D Preferred Stock of Brammo (instead of the Series C Preferred Stock provided for in the December 2013 MOU) for an aggregate value of $4.5 million, to be paid with $3.5 million in cash and the remainder in the form of the $1 million in redeemed Series C Preferred Stock. EVIP was relieved from any further obligation to purchase Series C Preferred Stock. However, the Joint Venture Agreement also provided that other purchasers would purchase no fewer than 6,666,667 shares of the Series D Preferred Stock for $5 million. The Joint Venture Agreement reflected that, by the next month, Brammo would make available for sale no less than an additional 13,333,3332 shares of Series D Preferred Stock to purchasers acceptable to Brammo in its sole discretion. Section 2.1 provided:

> Issuance of Brammo Series D Preferred Stock. . . . Concurrently with the execution and delivery of this Agreement; (x) Brammo is redeeming the Brammo Series C Preferred Stock previously purchased by Terracap Ventures Inc. for a price of $1,000,000, which shall be paid as a credit against the purchase price of the Brammo Series D Preferred Stock purchased pursuant to clause (y) below and which Terracap Ventures Inc. hereby agrees is in full payment therefor, (y) the Terracap Shareholder[1] (or its Affiliate) is purchasing from Brammo 6,000,000 shares of Brammo Series D Preferred Stock for a total purchase price of $4,500,000, and is entering into the Brammo Shareholder Agreements, and (z) other purchasers are purchasing from Brammo not less than 6,666,667 shares of Brammo Series D Preferred Stock for a total purchase price of not less than $5,000,000. In addition, on or prior to March 14, 2014, Brammo shall make available for sale no less than 13,333,333 shares of Brammo Series D Preferred Stock, at a price no greater than $0.75 per share, to purchasers acceptable to Brammo in its sole discretion, including without limitation purchasers that are Affiliates of the Terracap Shareholder,

---

[1] The "Terracap Shareholder" is defined in the Joint Venture Agreement as EVIP and its permitted successors and assigns. Dkt. No. 43-2 at 1.

subject to such purchasers entering into the Brammo Shareholder Agreements if not previously a party thereto. The transactions contemplated by Section 2.1 shall survive and continue in effect as separate transactions after any termination of this Agreement under Section 8.1 or otherwise.

Dkt. No. 43-2 § 2.1.

The Joint Venture Agreement also provided that, concurrent with its execution and subject to an escrow agreement with Brammo, Brammo EV, and an escrow agent, EVIP would receive 10 million shares of Brammo common stock to be held in escrow. *Id.* at 1. Half of those shares would be delivered in escrow at the closing of the Joint Venture Agreement and half would be delivered in escrow upon and in consideration for the transfer of the Better Place Assets, no later than 120 days after execution of the Joint Venture Agreement. *Id.* §§ 2.2-2.3. At the time of the signing of the Joint Venture Agreement, the escrow agreement had not yet been finalized nor had the escrow account been established. The parties agree that Brammo never delivered the 10 million common shares as required by the Joint Venture Agreement. Dkt. No. 41 ¶ 22.

The Joint Venture Agreement guaranteed that the Series D Preferred Stock that EVIP would receive would have the anti-dilution and other rights set forth in the "Brammo Articles" and "Brammo Shareholder Agreements": [2]

> All Brammo Series D Preferred Stock held by the Terracap Shareholder and their Affiliates shall be subject to the anti-dilution provisions and other rights applicable to the Brammo Series D Preferred Stock as set forth in the Brammo Articles and the Brammo Shareholder Agreements.

---

[2] Although the anti-dilution provision in the Joint Venture Agreement referred to the "Brammo Shareholder Agreements," which are defined as the "Fifth Amended and Restated Shareholders' Agreement and the Fourth Amended and Restated Right of First Refusal and Co-Sale Agreement, by and among Brammo and the other parties named therein and as amended and restated from time to time in accordance with its terms," Dkt. No. 43-2 § 1.11; *see* Dkt. Nos. 64-9, 64-10, the parties do not say anything about these two documents containing anti-dilution rights or otherwise being relevant to the dispute.

Dkt. No. 43-2 § 2.1.

The Joint Venture Agreement tied the grant of common stock to the conversion price of the Series D Preferred Stock, by providing that, in the event the conversion price of the Series D Preferred Stock were adjusted as a result of the anti-dilution provisions, the number of shares of common stock placed by Brammo into escrow for EVIP also would receive the same proportionate adjustment:

> Delivery of Brammo Common Stock. . . . If the conversion price of the Brammo Series D Preferred Stock issued concurrently with the execution and delivery of this Agreement is subject to anti-dilution adjustment, then additional shares of Brammo Common Stock shall be delivered to the Escrow Agent, to be held subject to the terms and conditions of the Escrow Agreement, such that the number of shares of Brammo Common Stock held by the Escrow Agent is increased in the same proportion that the conversion price of the Brammo Series D Preferred Stock is adjusted.

*Id.* § 2.3.

Aside from that provision, the Joint Venture Agreement did not provide that EVIP would receive any other anti-dilution protection other than what was available through the Brammo Articles and Brammo Shareholder Agreements.

### 3.    Brammo Articles

The anti-dilution provision related to the Series D Preferred Stock in the Joint Venture Agreement referred to the "Brammo Articles," which the Joint Venture Agreement defined as "the Fifth Amended and Restated Certificate of Incorporation of Brammo, as amended and restated from time to time in accordance with its terms" (the "Fifth Charter"). *Id.* § 1.7.

The Fifth Charter was executed by Brammo on February 14, 2014, the same date that the Joint Venture Agreement was executed, and filed with the Delaware Secretary of State four days later, on February 18, 2014.  Dkt. No. 41 ¶ 15; *see* Dkt. No. 43-3.

Section 4.4.7 of the Fifth Charter gave full ratchet anti-dilution protection to Series D Preferred Stock holders as a class.  It provided that if any additional shares of common stock were issued at a price lower than the existing conversion price of the Series D Preferred Stock (e.g., $0.75), thereby diluting the rights and presumably the value of the Series D Preferred Stock, the conversion rate for the Series D Preferred Stock would be adjusted to reflect the consideration received by Brammo for the additional shares (thereby permitting the Series D Preferred Stock holder to purchase more shares of the common stock to make up for the dilution of the value of the common stock to which the Series D Preferred Stock entitled them prior to the adjustment):

> Special Adjustment of Series D and Series C Conversion Prices Upon Issuance of Additional Shares of Common Stock. In the event the Corporation shall at any time after the Filing Date issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Subsection 4.4.3), without consideration or for a consideration per share less than the Conversion Price of the Series D Preferred Stock or the Series C Preferred Stock, in each case in effect immediately prior to such issue, then each such Conversion Price shall be reduced, concurrently with such issue, to the consideration per share received by the Corporation for such issue or deemed issue of the Additional Shares of Common Stock; provided that if such issuance or deemed issuance was without consideration, then the Corporation shall be deemed to have received an aggregate of $0.01 of consideration for each such Additional Shares of Common Stock issued or deemed to be issued.

Dkt. No. 43-3 § 4.4.7; *see* Dkt. No. 65 ¶ 59.

The Fifth Charter permitted a vote by the holder of a majority of the Series D Preferred Stock to eliminate this protection.  Specifically, the consent or vote of the holders of a majority of Series D Preferred Stock could permit Brammo to:

> Create additional classes of series of capital stock or increase the authorized number of shares of any class or series of capital stock, unless they ranked junior to the Series D Preferred Stock, Dkt. No. 43-3 § 3.3.1(a);

> Adjust the Series D conversion price as a result of issuance of additional shares of common stock, *id.* § 4.4.2(d)

Waive "any of the rights, powers, preferences and other terms of the Preferred Stock set forth herein," *id.* § 8.

The Fifth Charter did not contain provisions permitting EVIP to block or veto the vote of the majority, and the Joint Venture Agreement made no other accommodations to EVIP in the event that the majority decided to vote to take one of these actions.

As a result, because the anti-dilution protection for EVIP's common stock was tied to and derivative of the adjustment of the conversion price pursuant to the anti-dilution provisions of the Series D Preferred Stock, *see* Dkt. No. 43-2 § 2.3, if the majority of Series D Preferred Stock decided to waive the anti-dilution provisions attendant to those securities, the effect would be to defeat the anti-dilution protection for EVIP's common stock.  In other words, since Section 2.3 of the Joint Venture Agreement made Brammo's obligation to deliver additional shares of common stock to account for dilution conditional upon "the conversion price of the Brammo Series D Preferred Stock issued concurrently with the execution and delivery of this Agreement [being] subject to anti-dilution adjustment," *id.*, if the Series D Preferred Stock was not subject to anti-dilution adjustment, neither would the common stock be subject to anti-dilution adjustment.

Plaintiffs allege that they tasked Defendants with obtaining minority veto rights in connection with the negotiation of the anti-dilution provisions but Defendants failed to do so. Plaintiffs also allege that Defendants failed to inform them that Plaintiffs' lack of a minority veto right, and these majority consent provisions in the Fifth Charter, would permit the majority Series D Preferred Stock holder effectively to "waive" their anti-dilution protection.  Had Plaintiffs known of that possibility, they claim they would not have entered into the Joint Venture Agreement under those terms.

9

### 4.    Series D Purchase Agreement

On February 19, 2014—after the Joint Venture Agreement was executed and the Fifth Charter filed with the Delaware Secretary of State—Brammo, EVIP, and other investors executed the Series D Preferred Stock purchase agreement (the "Series D Purchase Agreement"). Dkt. No. 41 ¶¶ 16, 17; *see* Dkt. No. 43-4.  McDougall signed the agreement "on behalf of" Krauss as president of EVIP.

Through that agreement, EVIP purchased the 6 million shares of Series D Preferred Stock for $4.5 million agreed to in the Joint Venture Agreement, of which $3.5 million was paid in cash and $1 million was paid through the proceeds of redemption of the Series C Preferred Stock.  At the same time, the agreement reflected that other investors, including RMF Financial, LLC ("RMF") and Aviva Investors Global ("Aviva"), were purchasing Series D Preferred Stock. Those other purchasers were signatories to the Series D Purchase Agreement.  The amount of shares that each investor purchased, and the fact that Aviva was the holder of the majority of the Series D Preferred Stock, was included in Exhibit A attached to the Series D Purchase Agreement.  Dkt. No. 43-4, Ex. A.

RMF purchased 333,334 shares of Series D Preferred Stock.  *Id.*, Ex. A.  Aviva purchased 6.6 million shares of Series D Preferred Stock (i.e., more shares than EVIP), as well as 12 million warrants to purchase an additional 12 million shares of Series D Preferred Stock.  *Id.* Even without the warrants, the agreement made Aviva the majority holder of the Series D Preferred Stock with 6.6 million shares out of an outstanding 12.9 million shares.  Each party paid $0.75 per share of Series D Preferred Stock, which was also the conversion price under the Fifth Charter.  *Compare* Dkt. No. 43-4 § 1.1(b), *with* Dkt. No. 43-3 § 4.1.1.

The Series D Purchase Agreement did not contain any separate special anti-dilution protection provisions but, like the Joint Venture Agreement, assured all its investors that their

Series D Preferred Stock would have the anti-dilution rights as set forth in the Fifth Charter.  *See* Dkt. No. 43-4 § 2.2(b) ("The rights, privileges and preferences of the Preferred Stock are as stated in the Charter and as provided by the general corporation law of the jurisdiction of the Company's incorporation.").[3]

Moreover, and like the Fifth Charter, the Series D Purchase Agreement made clear that the rights of the Series D Preferred Stock holders as a class could be amended, terminated, or waived with the written consent of Brammo and holders of a majority of its then-outstanding shares of Series D Preferred Stock if such action decreased the rights or obligations of the Series D holders as a group.  The amendment required the written consent of the party affected only if its rights or obligations were increased (and not decreased):

> [A]ny term of this Agreement may be amended, terminated or waived only with the written consent of the Company and the holders of a majority of the then-outstanding Shares, *provided* that, this Agreement may not be amended or waived in a manner which increases the rights or obligations with respect to any party without the written consent of such party. Any amendment or waiver effect in accordance with this Section 6.8 shall be binding upon the Purchasers and each transferee of the Shares (or the Common Stock issuable upon conversion thereof), each future holder of all such securities, and the Company.

*Id.* § 6.8.

The combined effect of the Joint Venture Agreement, Fifth Charter, and Series D Purchase Agreement was to provide the majority holder of the Series D Preferred Stock the right to determine whether, and to what extent, any of the rights attached to the Series D Preferred Stock, including that purchased by Plaintiffs, could be modified or waived with no ability of

---

[3] The Series D Purchase Agreement defines "Charter" as the "Fourth Amended and Restated Certification of Incorporation in the form of Exhibit B attached," Dkt. No. 43-4 § 1.1(a), as opposed to the Fifth Charter.  But the exhibit list in the Series D Purchase Agreement names the Fifth Charter as exhibit B, the attached exhibit B is in fact the Fifth Charter, and the parties agree that the agreement refers to the Fifth Charter, which was the certificate of incorporation in effect at that time.

EVIP to exercise a minority veto if the majority holder believed such decision to be in its best interests and the interests of the class.  It also thereby gave the majority holder the ability indirectly to adversely affect the conversion rights of the common shares held by EVIP.

C.     **Brammo's Recapitalization**

A few months after the closing, in November 2014, Brammo ran into financial trouble.  It closed down for a week to conserve cash and informed Plaintiffs that it expected to implement significant layoffs and reduce salaried employees until it received more funding.  *See* Dkt. No. 43-17; Dkt. No. 64-15 at 16:4-10, 40:6-41:7.

In January 2015, Brammo agreed with the majority holders of each of the outstanding classes of its preferred securities to a recapitalization transaction pursuant to which all existing series of preferred stock, including the Series D Preferred Stock, were converted to common stock and new stock was issued in the form of Series R Preferred Stock.  Dkt. No. 41 ¶ 18; *see* Dkt. Nos. 43-19, 43-20.  Under the terms of the recapitalization, a holder of a then-existing series of preferred stock who decided to purchase Series R Preferred Stock would have, with respect to the new Series R Preferred Stock, the same anti-dilution protection as applied to their then-existing series of preferred stock.  If Brammo issued additional shares of common stock at a price lower than the existing conversion price of the Series R Preferred Stock, thereby diluting the rights and presumably the value of the Series R Preferred Stock, the conversion rate for the Series R Preferred Stock would be adjusted to reflect the consideration received by Brammo for the additional shares (thereby permitting the Series R Preferred Stock holder to purchase more shares of the common stock to make up for the dilution of the value of the common stock to which the Series R Preferred Stock entitled them prior to the adjustment).  If a holder of the Series D Preferred Stock did not agree to purchase the Series R Preferred Stock, its common stock, previously converted from preferred shares, would receive no such benefit.

The recapitalization was achieved through the execution of Brammo's Sixth Amended and Restated Certificate of Incorporation ("Sixth Charter") on January 12, 2015.  Dkt. No. 43-19 §§ B(1), 3.2.  A majority of the holders of each series of preferred stock consented in writing to the transaction, including Aviva, which was the majority holder of the Series D Preferred Stock. Dkt. No. 41 ¶ 19; Dkt. No. 43-20.  EVIP did not consent.

EVIP chose not to purchase Brammo's newly issued Series R Preferred Stock and not to put additional money into Brammo.  Dkt. No. 66 at 7-8.  Aviva did choose to make a further investment in the company and received Series R Preferred Stock.  As a result, as part of the recapitalization, Brammo converted EVIP's Series D Preferred Stock to common stock without making any price adjustment for the new common stock.  As a further result, because the conversion price of Series D Preferred Stock was not adjusted, the number of shares of common stock to which EVIP was entitled under the Joint Venture Agreement also was not adjusted.  *See* Dkt. No. 43-2 § 2.3.

On or about October 12, 2017, Brammo sold its assets to Cummins Inc. ("Cummins") for $70 million.  Dkt. No. 41 ¶ 20.  Pursuant to that acquisition, the holders of Brammo common stock were each entitled to receive 4.5 cents per share, plus a potential "earn out" based on the company's future performance.  *Id.* ¶ 21.  EVIP's share was calculated to be $720,676 based on its ownership of 16 million shares (i.e., the 6 million common shares converted from Series D Preferred Stock and the 10 million common shares required to be delivered in escrow under the Joint Venture Agreement).[4]  At the time of summary judgment briefing, Brammo had not yet released the $720,676 to EVIP as part of Cummins' purchase because EVIP refused to sign a

---

[4] Thus, even though, as noted, Brammo never delivered the 10 million common shares to EVIP as required by the Joint Venture Agreement, it received payment in consideration of those shares as if they had been delivered.  Dkt. No. 41 ¶ 22.

release and indemnity in favor of Brammo.  *Id.* ¶ 23; Dkt. No. 65 ¶¶ 84-85.  However, at oral

argument, Plaintiffs did not deny that they have since settled with Brammo and received the

$720,676.  Hr'g Tr. at 16:18-17:3.

## II.     Retention and Involvement of Schnader Harrison

### A.     Schnader Harrison's Representation in Connection with the Joint Venture Agreement

The parties agree that Plaintiffs engaged Schnader Harrison and Handel, specifically, as

legal counsel around the time of the October 2013 MOU.  No engagement letter was signed.

Defendants were not involved in the negotiation of the October 2013 MOU.

The first communication between Plaintiffs and Defendants regarding the Joint Venture

occurred the day after the October 2013 MOU was executed.[5]  On October 30, 2013, McDougall

emailed Handel at his Schnader Harrison email address.  The email reflected the terms of the

agreement that were then being discussed:

> We are working with Brammo Inc. on a quick turnaround for a Series C preferred
> share investment. They are a Delaware company located in Oregon involved in
> electric vehicle manufacturing and distribution.
> Can you advise if you are available over the next few days to assist with this deal
> and also provide a quote.
> Deal Notes:
> - The total investment is $5,000,000
> - We are making an initial investment of $2,000,000 in the next few days
>   under significant time pressure (balance expected to close before end of
>   November) in order to demonstrate to Brammo/Brammo BOD that they
>   should invest in a JV with us.
> - As a condition of this investment we are creating a JV with Brammo to
>   develop IP and software of another company called Better Place, which we
>   are purchasing out of bankruptcy in Israel ("BP Assets").
> - If we do not execute a definitive agreement with Brammo respecting the
>   JV, and we do not close the purchase of the BP Assets, we have asked for
>   and received the option to put the shares back to Brammo.

---

[5] The parties agree that Defendants were not involved in the selection of Brammo and did not
have any input in the creation of the October 2013 MOU executed on October 29, 2013.  Dkt.
No. 41 ¶¶ 8, 10.

- I have attached the deal docs along with the PUT which I just received. I have not reviewed any of the docs, and only add at this point that Brammo has just additionally offered warrants that we would keep in the event the deal goes south and we exercise the put.

Please let me know if you have any questions.

Dkt. No. 43-7.

Handel responded the same day: "I can start working on it this afternoon and tomorrow but am out of town for a Board meeting on Friday; next week is generally clear. I can probably have one of my partners (who I have worked with for a long time) work with me on it. After we review the documents, we will give you a ballpark quote this afternoon or tomorrow." *Id.* McDougall responded, "Thanks Joel – I would appreciate if you can get us a quote today. We are looking to close the initial investment by Friday!" *Id.* After Handel asked a few questions about a provision regarding a put option, Handel provided a quote to McDougall: "Don, If all we are doing is working with the Put and [stock purchase agreement] then we can review and cha[r]ge for probably in the range of 3-5K; the Cahrter [sic] and shareholder agreements are voluminous and undoubtedly not subject to negotiation. We would just quickly scan them to see if there is something you should be warned about. Let me know." *Id.* McDougall forwarded the email to Krauss, stating "See below and advise asap. thanks." *Id.* Krauss responded, "Get Brammo's commitment to cover cost. If it is complex, it is their docs that cause it to be so." *Id.*

On October 31, 2013, McDougall, cc'ing Krauss and Handel, asked Brammo to send the agreement for the Series C Preferred Stock to "my counsel." Dkt. No. 64-7. McDougall, Handel, and Sarah Hewitt ("Hewitt"), a corporate partner at Schnader Harrison, then exchanged emails regarding the agreement. Handel told McDougall that "it looks like you can go ahead and sign the documents." Dkt. No. 64-46. McDougall responded, "Thanks Joel I unfortunately have one further issue . . . The [October 2013] MOU provided for a ratchet (section F(A) of the

attached). How can this be addressed in the documents?"  *Id.*; *see also* Dkt. No. 64-7 ¶ F.
McDougall added that he just spoken with Craig Bramscher ("Bramscher"), the CEO of
Brammo, who "told me it is covered off in the articles, however it looks to me like it is just
weighted-average anti-dilution."  Dkt. No. 64-46.  Hewitt responded that she reviewed the
articles and agreed with McDougall that it looks like they contained "weighted average anti
dilution."  She advised that if the October 2013 MOU "was meant to call for full ratchet
antidilution, such agreement should be clarified in the purchase documents and stated to override
the articles."  McDougall asked, "Can you add the language to the agreement in the morning."
Hewitt later forwarded the email to Handel to ask "Does this make sense?"  Handel responded,
"It can't hurt to add it; we needn't worry now about enforceability."  A bill record show a
November 1, 2013 entry by Sarah Hewitt for "revision of subscription agreement for full ratchet
antidilution."  Dkt. No. 64-34.

Separately, on the same day, Krauss emailed Handel and McDougall to ask, "Is ratchet
settled?"  Dkt. No. 64-36.  After McDougall responded, "No," Krauss replied, "That needs to be
settled b4 we can advance funds. Our 2m shldnt be treated any worse than the next 23m that goes
into the deal."  Handel responded, "Why won't they agree to treat your funds on a parri passu
basis with the next funds it makes sense."  Handel then forwarded the email to Hewitt to say,
"This seems new to me" and added "[t]ypically Larry that [sic] almost after the fact he indicates
what he wants but didn't negotiate for it cleverly up front."  *Id.*

Terracap closed its acquisition of Series C Preferred Stock the following week on
November 6, 2013 and acquired the Better Place Assets on November 12, 2013.  Dkt. No. 41
¶¶ 11-12.  There is no evidence that Defendants were involved in the acquisition of the Better
Place Assets.

On November 14, 2013, after the acquisition of the Better Place Assets, Handel emailed Krauss and McDougall to say that he had gone through the draft Joint Venture Agreement and noted issues to consider "which are different from or not covered by the MOU," including that there was nothing in the draft about adjusting the shares that Plaintiffs would receive upon conversion based on future offerings. Dkt. No. 64-33. McDougall responded on November 20, 2013, "I would like to push back on this to get some sort of discount and/or anti-dilution protection in the event there is a down-round." *Id.*

The December 2013 MOU was signed on December 2, 2013. The parties disagree as to Defendants' involvement. Defendants deny that they had any input in the negotiation or drafting of the December 2013 MOU. Dkt. No. 65 ¶ 28. They cite to deposition testimony by McDougall that states he did not recall whether anybody at Terracap had any discussions with anyone at Schnader Harrison regarding the December 2013 MOU. Dkt. No. 43-29. Handel testified that the scope of the work he was to perform for Plaintiffs was "to work on the joint venture agreement." Dkt. No. 64-12 at 60:25-61:7. Plaintiffs respond that "Defendants reviewed and commented on" the December 2013 MOU, Dkt. No. 65 ¶ 28, but do not provide drafts or emails reflecting such comments, instead citing to McDougall's deposition testimony that Handel was supposed to advise Terracap with respect to any legal issues that came up generally "on this deal" and that he was supposed to "review the anti-dilution provisions in the agreements," Dkt. No. 64-14 at 190:6-13, 191:8-16. Regardless, as noted, the December 2013 MOU contained the language, "Terms will include full ratchet anti-dilution protection for the remainder of the C round, and weighted average protection thereafter," Dkt. No. 43-9 ¶ F, evidently reflecting McDougall's desire for "some sort of discount and/or anti-dilution protection in the event there is a down-round."

On December 10, 2013, Plaintiffs sent to potential investors a private placement memorandum created by Brammo regarding an opportunity to invest in the Joint Venture through Brammo.  The private placement memorandum reflected the fact that Brammo was seeking additional funds for the enterprise, containing the statement that Brammo was seeking an investment of $8.9 million in Brammo in exchange for Brammo common and preferred shares and a 50% interest in the Joint Venture.  Dkt. No. 43-10.  Under "Risks Related to the Offering," the memorandum warned: "In the event we need to raise additional capital, we may be forced to issue securities that have price, rights, preferences and privileges more favorable than yours, and dilution of your economic and ownership interest may result."  *Id.*

The December 2013 MOU having been signed, on December 11, 2013, McDougall sent Handel "our comments" on the Joint Venture Agreement.  McDougall stated, "I hope that you can get some color from our comments on where our heads are at, and offer any further advice/suggestions accordingly."  Dkt. No. 64-38.  Included in those comments were comments on Section 2.1 of the Joint Venture Agreement, which was the provision that contained Brammo's obligation to redeem the Series C Preferred Stock that EVIP had purchased and EVIP's obligation to purchase what became referred to as the Series D Preferred Stock. McDougall wrote, "[P]lease confirm that the full ratchet anti-dilution rights of Series C do not cease after the closing of the Series C round. I believe this is correct but for some reason I had it in my head that the full ratchet rights terminated after close of C round."  *Id.*

On Friday, December 20, 2013, McDougall emailed Handel a second set of "comments, with a view that we want to wrap this up and sign the agreement on Monday at the latest."  Dkt. No. 64-39.  He attached the draft Joint Venture Agreement and asked, "Section 2.1 – larry is asking for your confirmation that our full ratchet anti-dilution provision extends to the issuance

of any security, including a series D financing etc."  Neither party provides an email with a response from Handel.  Instead, Plaintiffs point to Handel's deposition testimony in which he testified that he did not recall his response on that point.  Dkt. No. 66 at 11 (citing Dkt. No. 64-12 at 184:9-24).

On January 30, 2014, Bramscher emailed Krauss with "feedback from the Brammo investors."  Dkt. No. 43-11.  That feedback included rolling the Series C Preferred Stock into Series D Preferred Stock, which Krauss agreed to so long as it was not excluded from the balance Plaintiffs would pay towards the Series D Preferred Stock transaction.  *Id.*  The email reflected that Brammo put a reduced value on the Better Place Assets and thereby on the Joint Venture, which led Plaintiffs in turn to reduce their investment in Brammo from $5 million to $4.5 million.  *See* Dkt. No. 65 ¶¶ 31-32.

On February 6, 2014, McDougall emailed Handel with a bullet list of the terms of the "revised deal."  It noted: "The common stock granted to the JV or Terracap . . . is transferred 50% at closing and the remaining 50% when all IP is contributed to JVCO as per documents approved by Joel and Bruce Kinn [ ]."  Dkt. No. 64-35.

On February 7, 2014, Krauss emailed Handel with subject line "Series D" regarding the rights of the Series D.  The email stated: "While not fleshed out in negotiations, [Series D] has priority over Series C and would need to be parri passu with Series E ie the balance of funds being raised as per my discussions w the investors."  Dkt. No. 64-41.  Handel responded, "Understood."  *Id.*

The following Monday, February 10, 2014, Bramscher informed McDougall that the pre-money valuation of Brammo was now $111 million, down from $250 million at the time of the October 2013 MOU and $215 million at the time of the December 2013 MOU.  Dkt. No.

43-12.  The change in the pre-money valuation resulted from the warrants being issued to Aviva, which reduced the value of the Series D Preferred Stock to holders by decreasing their effective interests in and rights with respect to their investment.  Bramscher expressed the need for the investor group to satisfy Aviva: Aviva "has become the driving force behind the investor group," and "[i]n order for Aviva to continue being a leading investor and be able to invest additional in the future," Brammo needed to "activate the anti-dilution" and issue warrants for Aviva to bring Aviva to parity with another investor, Polaris, who had received warrants in Series B financing round.  *Id.*

Key in this history is an email thread beginning on the next day, February 11, 2014.  The parties having initiated discussion about Aviva's role as "a leading investor," the email chain referred to the possibility that Brammo would issue further securities in order to obtain financing for the Joint Venture and to EVIP's rights as against Aviva in that eventuality.  Bramscher emailed McDougall a list of open deal items and said that Brammo needed everything finalized "today," including "final approval of Series D documents."  Dkt. No. 43-13.  McDougall forwarded the email to Krauss and Handel, stating "fyi."  *Id.*  Krauss asked McDougall, "Is series d priority and parri passu w series E," and McDougall responded, "No because series e does not exist yet. we will go nowhere with this request."  Krauss replied to McDougall, "Then at very least we need to approve the next terms."  McDougall cc'ed Handel and responded, "Next terms require approval of majority of Series D. If we are at 4.5 and Aviva (or others) are at 5 or 5.5 we would obviously not have majority. I will see where I can get to with Craig [Bramscher]."  Krauss responded, "We need some approval right. Aviva may have a conflict next time around."  The email self-evidently reflected Krauss's understanding that in the absence of "some approval right," the rights of the Series D Preferred Stock class could be modified by the holder of the

majority of Series D Preferred Stock—without the consent of EVIP—as well as that McDougall, and not the lawyers, were the negotiators on the transaction.

The email chain ends without any further discussion of an approval right or any further discussion of the rights that Aviva and others would have as a result of owning the majority of the Series D Preferred Stock.

That same day, McDougall emailed Bramscher at Brammo to inquire about an approval right in the event that Aviva had more shares of the Series D Preferred Stock than EVIP or decided to modify the rights of that security in the event of a further financing:

> We are still waiting the revisions from your counsel on Joel's comments but subject to anything further I am down to three points:
> . . . .
> 2. Series D docs
> We are requesting (needing…) some sort of meaningful rights on terms of series E. right now we would have no say assuming Aviva is >$4.5m

Dkt. No. 43-14.  Bramscher responded, "2. Will get back to you, but don't think so."  Dkt. No. 43-15.  When asked at his deposition whether this conversation "indicate[d] . . . that Mr. Bramscher was saying that he did not think he would be able to get you the approval rights that you were requesting," McDougall responded, "It looks that way, yes."  Dkt. No. 64-14 at 114:2-6.

McDougall forwarded this email thread to Handel, "fyi."  Dkt. No. 64-43.  Handel responded to McDougall, "What we need is not to block them from doing what they want with the 'E' against other investors just that the E cannot be anything more than parri passu with the D shares held by Terracap; maybe that will sell because it only partially limits the E."  *Id.* McDougall responded, "They don't want to move on this."  Handel replied, "What if we have the option to swap for 4.5M of E shares."  *Id.*  Krauss intervened, "Interesting suggestion to have a swap to series E."  Dkt. No. 64-44.  The parties have not submitted any follow-up

correspondence on this point, including whether McDougall heard back from Bramscher, whether Krauss expected McDougall or Handel to handle further negotiations, or how the discussion on this point ended.

On February 12, 2014, Krauss emailed only McDougall to say, "Need final docs to review before signing pls."  Dkt. No. 43-15.  Krauss's declaration states that when he said "need final docs to review before signing pls," he meant "simply that Terracap's counsel should make sure he receives and reviews a final set of deal documents to ensure that they provided the level of protection that Terracap repeatedly advised Handel was needed before our signature pages would be released."  Dkt. No. 62 ¶ 22.

The following day, February 13, 2014, an escrow verification advisor emailed McDougall to inform him that an escrow agreement would not be finalized for 2-4 days, which would be after the closing of the Joint Venture Agreement.  Dkt. No. 43-16.  McDougall forwarded the email to Handel and Bramscher to ask: "Are we comfortable moving ahead with this and making whatever reps/warrants are required or do we need to have escrow in place at closing?"  *Id.*  Handel replied only to McDougall, advising him that Plaintiffs should wait to have the escrow in place before closing:  "I think it has to be in place and the shares from Brammo and B-Con delivered at the time of signing the JV agreement; a good reason for doing it next week; we aren't in a rush are we? ; I think we agree today that there are to be no further changes to the JV agreement (after our requests are handled) and 'close' as soon as we can."  *Id.* McDougall responded, "ok."  *Id.*

Later on the same date, Handel emailed McDougall in connection with the asset transfer, stating that "other then they haven't dealt with your two comments in your 7:33 email. I don't see any issues in the documents . . . we can tell Brammo that we are ok with the documents –

need to clear who the directors are, and amend the BVI charter but we are all agreed on the documents and will sign." Dkt. No. 64-25.[6]

On February 14, 2014 at 5:37 p.m., McDougall emailed Krauss and Handel, stating that it was "unfortunate" Krauss was "not able to call, and as I suspected I am caught in an extremely difficult position." Dkt. No. 64-49. McDougall relayed that Bramscher had told him "Aviva is beyond pissed off at how long all of this has taken," and Plaintiffs were "in danger of them pulling the plug if we do not close this by 6pm eastern." *Id.* McDougall stated that the "only item" left in the Joint Venture Agreement was Section 2.5(d), concerning the operating advance EVIP was to provide to the joint venture entity, which Brammo "amended such that Brammo cannot unreasonably withhold approval of any third party financing at a valuation of $15 or more (at which time the advance would convert)." *Id.*[7]

McDougall did not say anything about Section 2.1, the section that related to the issuance of the Series D Preferred Stock. At 10:58 p.m. the same day, McDougall forwarded this email to an unknown third party to say "Confidential. By the way my lawyer said fuck it and send the docs." Dkt. No. 64-49. McDougall testified that Krauss did not contact him in this time but that

---

[6] The parties have not provided any additional information about this 7:33 email or otherwise relied on it in their briefing or at oral argument.

[7] The final version of Section 2.5(d) concerns the "Operating Advance," which is the obligation of EVIP to contribute $1 million in cash to Brammo "[f]rom time to time as needed during the first six months following the first Closing" in order to "fund the capital requirements of the Company, as determined by the Board from time to time." Dkt. No. 43-2 § 2.5(a). Section 2.5(d) states: "The Operating Advance shall bear interest accruing at the rate of 6% per annum. If third party equity capital is raised, then the Operating Advance and all interest accrued thereon shall automatically convert into the same securities issued in such equity financing, at a price equal o 80% of the price paid by third parties, and upon substantially the same terms as third parties. If no third party capital is raised, then upon liquidation of the Company the Operating Advance and all accrued interest will automatically convert to shares of Class A Common Stock at a conversion price equal to $3,750 per share. [Brammo EV] shall have the right to participate in an initial third party financing in the amount of $1,000,000 at the same discount applicable to the Operating Advance." *Id.* § 2.5(d).

he spoke to Handel on a phone call, who told him to release the signature pages.  Dkt. No. 64-14 at 211:20-216:7.

The Joint Venture Agreement was executed on February 14, 2014, and the Fifth Charter was executed the same day and filed on February 18, 2014.  The Series D Purchase Agreement was executed on February 19, 2014.

**B.      Schnader Harrison's Communications with Plaintiffs and Brammo in Connection with the Recapitalization**

On January 8, 2015, Brammo sent its shareholders—including EVIP—a stockholder consent and other documents related to the recapitalization and Series R financing, including the proposed Sixth Charter.  Dkt. No. 64-51.  McDougall had since left Terracap's employ.  *See* Dkt. No. 65 at 53 ¶ 13; Dkt. No. 64-14 at 15:15-21.  The stockholder consent agreed to the issuance of the Series R Preferred Stock, to amend the Fifth Charter through adoption of the Sixth Charter, to elect certain persons as directors of Brammo, and to waive any adjustment to the conversion price applicable to any series of preferred stock that otherwise would have resulted from the sale and issuance of any securities pursuant to the Series R Preferred Stock financing, as provided by the Sixth Charter.  Dkt. No. 43-20.  As described previously, the Sixth Charter ensured that, in the event that Brammo issued additional shares of common stock at a price lower than the existing conversion price of the Series R Preferred Stock, investors in Series R Preferred Stock who previously owned the Series D Preferred Stock would have the opportunity to purchase additional shares of the common stock to make up for dilution of the value of the common stock to which the Series D Preferred Stock entitled them prior to the adjustment.  It thus provided an incentive for Series D Preferred Stock investors to invest in the Series R Preferred Stock.

Krauss forwarded the email to Handel and said, "Perhaps we sign with a caveat?"  Dkt. No. 64-51.  Handel responded to Krauss, "We will discuss in the morning" and "I think we must

[put] them on notice before the conversion to protect you." Dkt. No. 64-51. He stated further, "The notice to Craig [Bramscher] could be that we want his confirmation that we will receive the dilution protection and then we will consent." *Id.* In response to Krauss's question about the anti-dilution protection expiring after the closing of the Series R financing ("Why would the right disappear after closing?"), Handel responded, "Because you no longer own the preferred." *Id.* In other words, the Series D Preferred Stock would be automatically converted. Handel stated that Brammo's "charter permits them to amend the rights of the preferred holders if a majority of the class approves," and Plaintiffs' "anti-dilution covered the preferred not your common." *Id.* Krauss responded: "Hold on. The anti-dilution was to apply to both our preferred and common"—in other words, EVIP should receive protection against the dilution of the common shares it was to receive under the Joint Venture Agreement. Handel replied that the "only specific reference I have found relating to anti-dilution" was in Section 2.1 of the Joint Venture Agreement (i.e., the section regarding the issuance of the Series D Preferred Stock) and that "[i]f you recall any other agreement I will try and find the provisions." *Id.* When Krauss responded, "The anti-dilution was for both the series d and the common separately," Handel replied, "Yes; I agree but they are based on the presence of a Series D which they are wiping out; unless there is another agreement that has separate protection for the common." *Id.*

On January 13, 2015, Krauss responded to the same thread, stating that "Our deal w them was that if there is a dilution event, our 10m shares [i.e., the common shares] were to be subject to adjustment, given the lower valuation ie in this situation, they should be obligated to deliver to us an additional 10m common shares, irrespective of what happens to the Ds." *Id.* Handel stated that Brammo's position was, because the Series D Preferred Stock and common shares were linked, "the Preferred D will no longer exist because they are wiping it out and converting it to

common and there is no [separate] anti-dilution protection for the common." *Id.* Krauss replied

that "what troubles [him] is that the protection for the common that we had was linked to the

Series D. they were not connected in any way" and he wondered why they had been "connected

in this manner." *Id.* Handel offered his view that because Plaintiffs had contributed assets to the

Joint Venture in which they were protected by the anti-dilution provision, Brammo "should

protect your position and give you both more D shares prior to the reorg and contribute more

shares of common into the escrow." *Id.*

On February 27, 2015, Handel, on behalf of Plaintiffs, sent a letter to Brammo, notifying

Brammo of Plaintiffs' claim that Brammo had breached the Joint Venture Agreement by

terminating the anti-dilution protection of the Series D without EVIP's consent. Dkt. No. 64-52.

He also expressed the view that the Sixth Charter was not properly approved because Plaintiffs

were not afforded a vote as a separate class pursuant to Del. C. § 242(b)(2), which requires that

"[i]f any proposed amendment would alter or change the powers, preferences, or special rights of

1 or more series of any class so as to affect them adversely, but shall not so affect the entire

class, then only the shares of the series so affected by the amendment shall be considered a

separate class for the purposes of this paragraph." Del. C. § 242(b)(2). (That claim is not in this

case.)

On March 3, 2015, Handel emailed Krauss and Emil Savov ("Savov"), who was the head

of the venture capital team at Plaintiffs between June 2014 and May 2015, to update them that

Brammo's attorney had "indicated that there was some attempt in play to resolve the issue but it

required consent of two investors of Brammo so nothing could be assured."[8] Dkt. No. 64-56.

---

[8] Plaintiffs claim that Savov outranked McDougall during the time when their tenures at
Terracap overlapped (June-September 2014), which was after the Joint Venture Agreement was
signed. Dkt. No. 65 at 53 ¶ 13. McDougall left Terracap in or around September 2014. *See id.*;

He said that he had "expressed [his] personal opinion that selling a security for significant money and then taking away anti-dilution rights without consent was, in my experience, unheard of and I believe a court will feel the same." *Id.* Savov responded, "[W]e are also in discussion about how the Ser R investment was handled and the possibility of Terracap getting a board seat.  Even without participation in the Series R, Terracap is the third-largest shareholder in Brammo." *Id.* He added: "[T]oday I got a call from [Bramscher] Brammo's CEO. It seems that we were making good progress towards getting the board seat until your letter was received. If we change course quickly on this issue, there is possibility to avoid further damage. Otherwise I don't think we'll ever get a board seat." *Id.* Krauss replied, "I think we had no choice but to send the letter." *Id.*

On July 20, 2015, Handel emailed Krauss, "Th[is] is the issue with your agreements; since by amendment to the charter they converted your preferred to a non-convertible common they believe or claim you have no anti dilution [] protection. I believe that is a breach of the agreement with you without your consent."  Dkt. No. 64-26.  As in his February 2015 email to Handel, Krauss asked "was there language that gave the common the same anti dilution rights?" He added, "You would have been the only one to address it. If you didn't put it in the docs then it is simply not there."  Handel responded, "I was not running the negotiations, your associate was. He provided the comments and recommendations. You were protected by the existing documents which they changed without your consent."  Krauss responded, "[This] was the only point I emphasized ie that I had no idea whether the valuation was fair or reasonable and that we needed anti-dilution protection in both the Series D and the common shares. Moreover this was not even a point of contention with the company."

---

Dkt. No. 64-14 at 15:15-21.

Plaintiffs allege that Handel mistakenly thought that Brammo could not eliminate Terracap's anti-dilution protection without its consent, and even after Brammo refused to provide Terracap with anti-dilution protection in the Series R capitalization, Handel informed Terracap that Brammo was wrong.

### III.    Damages

Plaintiffs seek $8,095,868 in damages based on two sets of costs: (1) costs incurred to acquire and maintain the Better Place Assets that were assigned to the Joint Venture and (2) costs incurred in connection with the purchase of the equity in Brammo.  Dkt. No. 66 at 27-28.

As to the first set of costs, Plaintiffs seek $4,058,305 based on the $1,864,282 purchase price of the Better Place Assets and "necessary additional costs" in connection with their maintenance that total $2,194,023.  *Id*. at 27.[9]  They seek the purchase price as damages on the theory that, but for their mistaken understanding that they had minority veto rights to protect the anti-dilution provision, they would not have contributed the Better Place Assets to the Joint Venture, where they were "locked away in a non-performing joint venture for seven (7) years without a business plan and with no prospects for exploitation or monetization," Dkt. No. 66 at 25, and instead would have found a different potential joint venture partner, such as one of several public utility companies that expressed interest in the Better Place Assets, *id.* at 25-26. They claim the assets were "completely diminished" by their assignment to the Joint Venture. Hr'g Tr. at 35:21-22.  Plaintiffs seek damages based on maintenance costs because they

---

[9] These costs consist of: (1) legal costs in connection with the acquisition and maintenance of the Better Place Assets (e.g., patent renewal, defense of patents, and related litigation) of $1,223,946; (2) technical consulting costs related to the servers and network of $509,829; (3) web hosting and physical server moving costs of $167,500; (4) travel by Terracap employees to review the physical assets and Joint Venture fees paid pursuant to the Joint Venture Agreement of $242,611; and (5) finance raise fees and miscellaneous bank fees of $61,260.  Dkt. No. 66 at 27-28.

continued to pay the expenses associated with protecting the Better Place Assets, including making sure that all patents were current and renewed, because "[w]ithout Terracap's investment in maintenance of the assets, their value would have been diminished and ultimately destroyed." Dkt. No. 66 at 25.  They claim that "[t]he incurrence of all of these expenses without the corresponding creation of any revenue or asset value appreciation to use to pay or offset such costs, arose as a direct consequence of counsel's incorrect advice."  *Id.*

As to the second set of costs, Plaintiffs seek $4,037,563 based on their equity investment of $4.5 million, less the $720,676 that represents the value of Plaintiffs' shares in Brammo that would be paid to Plaintiffs upon Cummins' acquisition of Brammo.  Plaintiffs' claimed damages also includes $258,239 of debt service costs incurred by Krauss, who had personally financed part of the $4.5 million price on EVIP's behalf through a loan from an entity known as Alignvest.  *Id.*  Plaintiffs seek to recoup the money spent on the equity investment as damages on the theory that they would not have entered into the Joint Venture Agreement and related agreements had they known their anti-dilution protection could be waived by others.  They thus seek "to be put back in a position we would have been had malpractice not occurred."  Hr'g Tr. at 33:25-34:1.

## PROCEDURAL HISTORY

This case was initiated on December 7, 2018, Dkt. No. 1 ("Compl."), and was assigned to the Honorable Katherine Polk Failla.  The action proceeded through discovery after Defendants filed their answer on February 8, 2019.  Dkt. No. 13.  On February 4, 2020, the case was transferred to the undersigned.  Defendants filed their motion for summary judgment on March 6, 2020.  Dkt. No. 40.  Opposition and reply briefs were filed on June 19, 2020, and July 31, 2020, respectively.  Dkt. Nos. 66, 71.  At the same time, each party moved to exclude the expert testimony of the other party's expert.  Dkt. Nos. 45, 51.  That briefing was completed by July 31,

2020.  Dkt. Nos. 70, 73.  The Court held oral argument on only the motion for summary

judgment on February 19, 2021.

## LEGAL STANDARD

Summary judgment under Fed. R. Civ. P. 56 is appropriate where "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of fact is genuine if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact

is material if it might affect the outcome of the suit under the governing law." *WWBITV, Inc. v.

Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v.

Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

 "On summary judgment, the party bearing the burden of proof at trial must provide

evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, 2017 WL

477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986)).  "If the party with the burden of proof makes the requisite initial showing, the burden

shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, i.e.,

that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior

Packaging Grp., Inc.*, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014).  The nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and

must make a "showing sufficient to establish the existence of [every] element essential to that

party's case, and on which that party will bear the burden of proof at trial," *Celotex*, 477 U.S. at

322.  "To show a genuine dispute, the nonmoving party must provide hard evidence, from which

a reasonable inference in [its] favor may be drawn." *Hayes v. Dahlke*, 976 F.3d 259, 267 (2d

Cir. 2020) (internal citations and quotation marks omitted).  "The existence of a mere 'scintilla of evidence in support of the [nonmoving party's] position' [is] insufficient to create a genuinely disputed fact." *Id.* (quoting *Anderson*, 477 U.S.  at 252).

The Court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)) (internal quotation marks omitted).

## DISCUSSION

Plaintiffs' legal malpractice claims are based on Defendants' alleged failures: to notify them of a majority consent provision in the Fifth Charter that could permit the holder of the majority of the Series D Preferred Stock class to modify or waive the rights of the Series D Preferred Stock holders, to negotiate for a minority veto right to prevent the majority holder of a class from agreeing to a modification or waiver of the rights attendant to that security, and to advise Plaintiffs not to release their signature pages or funds until Brammo had delivered the first 5 million common shares of stock into escrow.  Plaintiffs also bring a breach of contract claim based on the same allegations.  Although the recitation of the undisputed facts of this case is necessarily long and somewhat complicated, the legal principles that decide it are relatively short and straightforward.

## I.    Legal Malpractice

Under New York law, "[f]or defendants in a legal malpractice action to succeed on a motion for summary judgment, evidence must be presented establishing that the plaintiff is unable to prove at least one of [the following] essential elements of a malpractice cause of action." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 118 (2d Cir. 2005) (quoting *Wester v. Sussman*, 757 N.Y.S.2d 500, 501 (2d Dep't 2003).  To state a claim for legal malpractice, a

plaintiff must allege "(1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006).

In order to demonstrate that a lawyer was negligent through a claim of legal malpractice, "a plaintiff must show that an attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession" and that "the attorney's breach of this professional duty caused the plaintiff's actual damages." *McCoy v. Feinman*, 785 N.E.2d 714, 718-19 (N.Y. 2002) (internal quotation marks and citations omitted). "What constitutes ordinary and reasonable skill and knowledge cannot be fixed with precision, but should be measured at the time of representation." *Darby & Darby, P.C. v. VSI Intern., Inc.*, 739 N.E.2d 744, 747 (N.Y. 2000). Generally, "ordinary and reasonable skill" is determined by looking to standards of legal practice in the State of New York. *See, e.g., Diamond v. Sokol*, 468 F. Supp. 2d 626, 637 (S.D.N.Y. 2006) (Lynch, J.) (discussing New York law practice commentary). "Reasonableness of a defendant attorney's conduct may be determined as a matter of law." *Id.* at 633. "In other words, defendant is entitled to summary judgment dismissing the case, where the record reveals no way a reasonable factfinder could find defendant to have been negligent." *Id.*

To establish the second element, "a lawyer must proximately have caused the client's claimed harm to be liable in malpractice." *Id.* at 642; *see Allianz*, 416 F.3d at 118 ("To establish the elements of proximate cause and damages, a plaintiff must show that but for the defendant's negligence, he or she would have prevailed in the underlying action or would not have sustained any damages."). "[C]ausation, is often described as the 'but for' aspect of the claim, and requires a plaintiff opposing summary judgment to show evidence from which a reasonable factfinder

32

could conclude that 'it is more probable that the [complained of] event was caused by the defendant than that it was not.'" *Diamond*, 468 F. Supp. 3d at 633 (quoting *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004)). "Ultimately, the factfinder in a legal malpractice action must, in effect, put herself in the shoes of the reasonable factfinder in the underlying suit and determine if the result there would have been different absent the alleged malpractice." *Id.* (quoting *Rubens*, 387 F.3d at 190 (citation omitted)).

Finally, a plaintiff must prove the existence of "actual and ascertainable damages" and, therefore, "[a]bsent proof of actual damages, a claim for attorney malpractice is unsupportable." *Ressis v. Wojick*, 481 N.Y.S.2d 507, 509 (3d Dep't 1984); *see Giambrone v. Bank of New York*, 677 N.Y.S.2d 608, 610 (2d Dep't 1998) (a plaintiff must offer more than "[m]ere speculation about a loss resulting from an attorney's alleged omission").

## A. Anti-Dilution Protection

### 1. Damages

Defendants argue that Plaintiffs lack standing to bring legal malpractice claims because they have not offered evidence that they suffered damages. Defendants focus on a peculiar aspect of this case. Neither Terracap nor EVIP paid any portion of the $1 million paid to Brammo in the Series C Preferred Stock financing, of the $3.5 million paid to Brammo for the Series D Preferred Stock financing, or of the money paid for the purchase of the Better Place Assets. Those monies were paid by Krauss, Krauss' family members, or affiliates of Terracap,[10] or other investors. They were not paid for as a loan to Plaintiffs and Plaintiffs paid no consideration to these payors in exchange for payment for the Brammo shares or Better Place

---

[10] Those entities are Terracap Management Inc. and Terracap Investments Inc., which are owned or controlled by Krauss or his family members. They are not parties to this action.

Assets.  Plaintiffs were not out-of-pocket.[11]  Moreover, Plaintiffs do not allege damage in connection with their Series D Preferred Stock or seek damages for the diminution in the value of their equity or of the Better Place Assets.  Thus, Defendants claim that the only damages sought in this case were not incurred by Plaintiffs.  They contend that those facts defeat standing.

Plaintiffs, for their part, do not deny that they did not pay the funds, that they did not borrow the monies paid for by Krauss, his family members, or these Terracap-affiliated entities for the equity or the Better Place Assets, and that they did not issue securities or equity or debt to these payors in exchange for their purchase of the Brammo equity and the Better Place Assets. They admit that Krauss paid for the $1 million purchase of the Series C Preferred Stock, Dkt. No. 65 ¶ 20, and Krauss paid for the $3.5 million purchase of the Series D Preferred Stock, *id.* ¶ 37.[12]  They also admit that Krauss, Krauss' family members, or the Terracap affiliated entities paid the $1,864,282 price for the Better Place Assets and paid the expenses to maintain the Better Place Assets.  *Id.* ¶ 22; *see also* Dkt. No. 62 ¶¶ 35, 37.  These funds were paid directly from Krauss or his family members or through a trust account at his law firm.  Dkt. No. 44 at 15-16; Dkt. No. 66 at 28-29.  They also admit that the only damages incurred were the payment sof those sums.

State and district courts in this Circuit have discussed this concept both in terms of damages and standing.  *Compare Kofinas v. Fifty-Five Corp.*, 2021 WL 603294, at *4 (S.D.N.Y.

---

[11] Specifically, Krauss paid for the $1 million purchase of the Series C Preferred Stock, Dkt. No. 65 ¶ 20, and Krauss paid for the $3.5 million purchase of the Series D Preferred Stock, *id.* ¶ 37. Krauss, Krauss' family members, or the Terracap affiliated entities paid the $1,864,282 price for the Better Place Assets and paid the expenses to maintain the Better Place Assets.  *Id.* ¶ 22; *see also* Dkt. No. 62 ¶¶ 35, 37.

[12] Although Plaintiffs state that the payors "advanced" these payments "on behalf" of Plaintiffs, the undisputed facts in discovery revealed, and Plaintiffs confirmed at argument, that Plaintiffs had no obligation to repay the funds "advanced."  Thus, the better and more accurate word is "paid."

Feb. 16, 2021) (finding standing established at motion to dismiss stage where "alleged damage to real property in which plaintiffs hold an interest constitutes injury in fact" but reserving whether plaintiffs actually suffered the alleged business lost income as a question of "damages" that was "an issue of fact to be resolved later")*, and Baccash v. Sayegh*, 862 N.Y.S.2d 564, 567 (2008) (plaintiff shareholder failed to establish a prima facie case of legal malpractice when she offered no proof that she sustained actual damages), *with Design Strategies, Inc. v. Davis*, 355 F. Supp. 2d 715, 717 (S.D.N.Y. 2005) (corporate plaintiff did not have standing to assert a claim resulting from an alleged harm affecting only interests of its shareholders).  To establish Article III standing, a plaintiff must allege (1) an injury-in-fact that is (2) fairly traceable to the defendants and (3) redressable by the Court.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Defendants challenge the first element, the injury itself, arguing that Krauss, and not Plaintiffs, suffered the injury because "no malpractice claim can lie" where "the damages allegedly caused by the malpractice were suffered not by the client, but by the client's shareholder or affiliate."  Dkt. No. 44 at 35. Plaintiffs respond that they suffered this concrete injury because they, as opposed to Krauss, entered into the Joint Venture Agreement and various shareholder agreements, were the owners of the shares and the Better Place Assets, and hired Defendants as their legal counsel.

Plaintiffs' theory of damages, however, does not match their stated injury.  With respect to the equity investment, Plaintiffs seek in damages the stock acquisition cost of $4.5 million paid by Krauss, plus debt service costs of $258,239 that Krauss incurred through a loan from a third-party entity.[13]  Dkt. No. 66 at 27.  Their theory of damages is that they would not have

---

[13] Plaintiffs seek this amount less the share of proceeds to Terracap of $720,676 as the result of a buyout of Brammo by third party Cummins.  Dkt. No. 66 at 27.

entered into the Joint Venture Agreement and the other share purchase agreements, and Krauss would not have paid these sums, if Defendants had properly advised them of the limits of the anti-dilution provision in those agreements, and thus they seek "to be put back in a position we would have been had malpractice not occurred."  Hr'g Tr. at 33:25-34:2.  But "had the malpractice not occurred," these Plaintiffs would not have had the $4.5 million in their possession because they never paid it; Krauss did.  Indeed, these Plaintiffs admit that they are not out-of-pocket for the $4.5 million (or the debt service costs).  *Id.* at 32:22-33:11.  Thus their position before and after the transaction as it concerns that sum is the same, and to award them damages for these expenses would be a windfall.  *See, e.g.*, *Campagnola v. Mulholland, Minion & Roe*, 555 N.E.2d 611, 613 (N.Y. 1990) ("The object of compensatory damages is to make the injured client whole.").  They did not suffer the damage they allege.

The same result follows for damages sought in connection with the purchase and maintenance of the Better Place Assets.  Plaintiffs allege that they were unable to profitably use the Better Place Assets because they were "locked away in a non-performing joint venture for seven (7) years without a business plan and with no prospects for exploitation or monetization."  Dkt. No. 66 at 25.  However, Plaintiffs do not submit any evidence that they would have been able to earn income from those assets if they had invested them elsewhere nor do they submit an estimate of foregone income or diminution in value of the assets as a result of them being "locked away."[14]  From Plaintiffs' submission, there is no evidence that the Better Place Assets

---

[14] As evidence of the Better Place Assets' value had Plaintiffs not assigned them to the Joint Venture, Plaintiffs submit a declaration from third-party investor Eric Selmon whom Terracap asked to review the Better Place Assets and consider how to monetize them.  But this after-the-fact declaration, which refers only to an expression of interest before the Joint Venture was signed, does not allege that this opportunity would have been more profitable and by what measure.  *See* Dkt. No. 63.

would have earned *anything* if they had not been placed in the Joint Venture and been left unfettered in Plaintiffs' hands.  *See, e.g.*, *Pellegrino v. File*, 738 N.Y.S.2d 320, 323 (1st Dep't 2002) ("[S]peculative damages cannot be a basis for legal malpractice. Conclusory allegations of damages also are insufficient.") (internal citations omitted).  Moreover, Plaintiffs seek damages for the entire $1,864,282 acquisition cost paid by Terracap Investment and a total of $3,193,023 in maintenance costs and fees for these assets paid by Krauss and other Terracap entities on the theory that the assets "were completely diminished by commission of those assets to the [] joint venture."  Hr'g Tr. at 35:14-24.  These Plaintiffs, however, cannot recover those sums.  They did not buy the Better Place Assets or pay the sums and thus they were not themselves damaged by the payment of the sums.  The acquisition cost was paid, and the Better Place Assets purchased, even before the retention of Defendants.  Any damages incurred from the payment for the Better Place Assets thus were not incurred by Plaintiffs and not incurred as a result of any malpractice by Defendants.

Plaintiffs argue that despite the fact that they did not pay for the various preferred stock or costs or expenses in connection with the Better Place Assets, they suffered damages in their capacities as the owners of the shares and Better Place Assets.  Dkt. No. 66 at 42.  Terracap was the owner and holder of the Series C Preferred Stock, and EVIP was the owner and holder of the Series D Preferred Stock.  Dkt. No. 65 ¶¶ 20, 33, 93.  EVIP was also the signatory on the Joint Venture Agreement and Series D Purchase Agreement.  Under the Joint Venture Agreement, EVIP was obligated to pay expenses in connection with the Better Place Assets. *Id.* ¶ 88.  But Plaintiffs do not submit evidence that EVIP lost anything as a result of the discharge of its obligations under the Joint Venture Agreement through payments by Krauss and the entities who are not parties to this lawsuit.

Plaintiffs' argument has been rejected by courts.  In *Baccash*, the sole officer and shareholder of a bridal shop brought a legal malpractice claim against an attorney who represented her in connection with a purchase of a trade name so she could open a store under that name.  Plaintiff alleged that that she was advised that she would have to purchase the store's inventory in order to acquire its trade name and she agreed to do so, but unbeknownst to her, her attorney negotiated a stock purchase rather than an asset purchase, thus requiring her to assume the store's trade debt and a bank loan guaranteed by the prior owner.  She alleged that she had sustained damages because the agreement that her attorney had negotiated without her knowledge required her to assume responsibility for the company's liabilities.  However, proof at trial revealed that all payments of the store's debt had been made by plaintiff's bridal shop, rather than plaintiff herself, and that her bridal shop had also paid for settlement of a creditor suit brought against both the bridal shop and the store.  Based on that evidence, the Appellate Division held that plaintiff failed to prove she had suffered any direct damages because her bridal shop had paid such debts, not plaintiff.  Although plaintiff was the bridal shop's sole officer and shareholder, the court stated that "a corporation has a separate legal existence from its shareholders even where the corporation is wholly owned by a single individual."  *Baccash*, 862 N.Y.S.2d at 567; *see also Harris v. Stony Clove Lake Acres, Inc.* 608 N.Y.S.2d 584, 586 (3d Dep't 1994) ("Courts are loathe to disregard the corporate form for the benefit of those who have chosen that form to conduct business.").  Similarly, in *Mobius Risk Group, LLC v. Global Clean Energy Holdings, Inc.*, 2011 WL 3568074 (S.D. Tex. Aug. 15, 2011), the district court held that defendant could not prove damages on its counterclaims of breach of contract and breach of fiduciary duty because it did not actually incur the costs in connection with the disputed purchase.  Instead, the entities it owned did so.

Plaintiffs similarly did not incur the costs in connection with the purchase of Series C or Series D Preferred Stock.  Plaintiffs also did not pay to acquire or maintain the Better Place Assets.  Before the Joint Venture, Krauss and other Terracap entities paid the sums necessary to maintain the Better Place Assets which were then owned by Terracap.  Dkt. No. 62 ¶¶ 38-39. After the Joint Venture, they continued to pay these maintenance expenses of the Better Place Assets that by then had been contributed to the Joint Venture by EVIP, which was the entity that owned a 50% interest in the Joint Venture.  *Id.*  Plaintiff characterizes Krauss and others' payments as "advances" or "on behalf of" Plaintiffs, but Plaintiffs admit that they did not borrow the funds and did not receive or enter into any loan, capital contribution, advance or other documented transaction whereby Krauss, an entity under his control, or another investor provided them with the funds to pay the expenses claimed as damages.  *Id.* Plaintiffs' accountant also testified as a Rule 30(b)(6) witness that these payments were not considered borrowed funds or loans.  Dkt. No. 43-31 at 151:13-153:2.  And in fact, the general ledger of the trust account maintained by Krauss' law firm shows that advances were made by Terracap Management Inc. for the "Better Place investment" to Terracap Investments Inc., not Plaintiff Terracap Ventures. *See, e.g.*, Dkt. No. 43-26.  Plaintiffs cannot seek damages on behalf of related Terracap entities. *See Hudson Optical Corp. v. Cabot Safety Corp.*, 162 F.3d 1148 (2d Cir. 1998) ("A corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined.") (quoting *Diesel Sys. v. Yip Shing Diesel Eng'g Co.*, 861 F.Supp. 179, 181 (E.D.N.Y. 1994)); *see also Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (rejecting argument that entities owned by the same parent can bring suit because they "were distinct legal entities, whose separate nature cannot simply be ignored when inconvenient" and "[i]t is black-letter law that one corporation cannot assert an affiliate's

legal rights"); *Feinberg v. Katz*, 2002 WL 1751135, at *6 (S.D.N.Y. July 26, 2002) ("Numerous courts have dismissed claims brought by corporations when the claims actually belong to a subsidiary or an affiliated corporation.") (citing cases).  Moreover, Krauss and his wife deducted the expenses claimed as damages on their personal tax return, including the $4.5 million and CAD 15,000,000 of expenses relating to the investment in the Better Place Assets and related expenses.  Dkt. No. 65 ¶ 93.  Neither Plaintiff deducted any of the claimed expenses.

Plaintiffs argue that a failure to find damages here means that a plaintiff in their position would have no remedy for an act of legal malpractice because Krauss, as shareholder, was not the client and does not have standing to bring these claims.  *See* Hr'g Tr. at 32:15-21, 37:7-15. But if that is the result in this case, it is only because these Plaintiffs suffered no damages.  It would not necessarily be so in every case.  Plaintiffs might have had a cognizable case if EVIP or Terracap had borrowed the funds advanced by Krauss and the other entities and were obliged to pay them back.  Plaintiffs also might have a cognizable damages theory if their damages were based not on the purchase price that Krauss and others paid, but rather on the decreased value in Plaintiffs' shares due to the Series R recapitalization and dilution or on the difference between the value of the shares as represented and as received.  But Plaintiffs stated at oral argument that they were not seeking such damages and that their sole theory of damages was to be placed in a position they would have been had the alleged malpractice not occurred.  Hr'g Tr. at 33:20-34:12.  Such theory fails based on the facts here.

### 2.    Duty of Care

Plaintiffs proffer two theories of attorney malpractice.  They allege, first, that Defendants failed to negotiate for and secure a minority veto or other approval right on their behalf.  They allege, second, that Defendants failed to advise them that the majority consent provision in the Fifth Charter could be used by others, without their consent, to eliminate the anti-dilution

protection enjoyed by the particular shares owned by them if they were not a majority holder of the class of the Preferred Series D Stock.  They claim that Defendants knew their concern about obtaining anti-dilution protection and should have alerted them to the provisions.

Plaintiffs do not identify a genuine issue of fact that would permit them to go forward on either theory.  On the undisputed facts, Defendants did not commit malpractice in failing to ask for a minority veto right because Plaintiffs never asked Defendants to negotiate at all—that was McDougall's responsibility.  Moreover, they have not identified a triable issue that they suffered damages as a result of the attorney's failure to ask for that right.  There is also no triable issue for Defendants' failure to inform Plaintiffs of the absence of a minority veto right because Defendants knew of the absence of that right and nevertheless decided to go forward with the transaction.  Plaintiffs, in essence, are trying to charge Defendants unfairly with liability for a deal that Plaintiffs knowingly entered into but that apparently went south.

### a.       Failure to Negotiate for Minority Veto Right

Plaintiffs' first theory of liability is that Defendants failed to exercise care in negotiating with Brammo for a minority veto right.  That claim fails both because there is no evidence that negotiating the terms of the Joint Venture Agreement and related agreements was within the scope of Defendants' duties and thus the care they were obliged to exercise, and because they have not demonstrated proximate causation.

It is axiomatic that a lawyer's duty to exercise care extends only as far as the scope of the representation.  *See* Restatement (Third) of the Law Governing Lawyers § 50 (2000) ("[A] lawyer must exercise care in pursuit of the client's lawful objectives in matters within the scope of the representation.").  "The lawyer is not liable for failing to act beyond that scope."  *Id.*; *see id.* § 16 ("The lawyer's duties are ordinarily limited to matters covered by the representation."); *see also CVR Energy, Inc. v. Wachtell, Lipton, Rosen, & Katz*, 830 F. App'x 330, 333 (2d Cir.

2020) (rejecting plaintiff's argument that "defendants were negligent in failing to negotiate [its] preferred fee terms" because "according to the amended complaint, it was [plaintiff] alone that negotiated the fee terms with the Banks, thus precluding a claim of attorney negligence under New York law"); *Sutherland v. Milstein*, 698 N.Y.S.2d 15, 16 (1st Dep't 1999) (attorney not negligent for role in the negotiation of an agreement the client "now find[s] unfavorable" where client "negotiated and controlled its terms"). The negotiation of a complex business transaction is a delicate matter. Each participant often has his or her defined role. A contrary rule would make counsel responsible for negotiating each agreement on which she provides advice would, in essence, require counsel to become an officious interloper interfering with what are often sensitive discussions, and where the "what, when, and how" is presented may make the difference between a successful transaction and a busted deal. It would also be unworkable. *See Preferred Fragrance, Inc. v. Buchanan Ingersoll & Rooney PC*, 2015 WL 6143612, at *8 (E.D.N.Y. Oct. 18, 2015) (discussing the importance that rules for legal malpractice be workable).

Plaintiffs' first theory of liability thus fails for the elementary reason that they do not present any evidence that negotiating the Joint Venture Agreement and related agreements was within the scope of the responsibilities Defendants were asked to assume and did assume. Handel and McDougall discussed the scope of Defendants' responsibilities at the outset of the engagement. Defendants would "review" the documents and, to the extent the documents were voluminous and not subject to negotiation, "just quickly scan them to see if there is something you should be warned about." Dkt. No. 43-7. For example, after the December 2013 MOU had been signed, McDougall sent Handel "our comments" on the Joint Venture Agreement and stated, "I hope that you can get some color from our comments on where our heads are at, and

offer any further advice/suggestions accordingly." Dkt. No. 64-38.  When Krauss and

McDougall later learned of the majority consent provision in February 2014, McDougall stated

that he would be responsible for negotiating for a minority right with Brammo.  *See* Dkt. No.

43-13 ("I will see where I can get to with Craig [Bramscher].").  Indeed, McDougall testified that

Handel was supposed to advise Terracap on any legal issues on the deal and to review the

anti-dilution provisions.  Dkt. No. 64-4 at 190:6-13, 191:8-16.  There was no suggestion that

Defendants were to negotiate the business terms of the transaction.  Every document presented

on the summary judgment record demonstrates that McDougall had that responsibility.  He was

the person who interacted with Bramscher, he and Krauss decided what issues to raise and when,

and he was the person who learned what Brammo (and the other investors) needed in the

transaction and conveyed that information to Krauss and to EVIP and Terracap.  Defendants'

role was advisory.

     The undisputed record thus establishes that it was McDougall (and Krauss) who

negotiated the terms of the Joint Venture Agreement and related agreements with Brammo.  That

"preclude[es] a claim of attorney negligence under New York law."  *CVR Energy Inc.*, 830 F.

App'x at 333.  Defendants cannot be negligent for failing to do something that they were never

asked to do and never agreed to do.

     Plaintiffs' first theory of malpractice also fails for a second reason.  "To establish the

element of causation, a plaintiff must show that he or she would have prevailed in [an]

underlying action . . . but for the attorney's negligence."  *Reid v. Sack*, 2021 WL 100490, at *4

(S.D.N.Y. Jan. 12, 2021) (citation omitted).[15]  "New York law requires that a plaintiff be able to

---

[15] In legal malpractice claims, this element of proximate causation is phrased by courts in terms
of "but for" causation.  *See, e.g.*, *Allianz*, 416 F.3d at 118 (the "proximate cause" inquiry in a
legal malpractice claim requires a showing "that but for the defendant's negligence, he or she

meet the 'case within the case' requirement, demonstrating that 'but for' the attorney's conduct the client would have prevailed in the underlying matter." *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills*, *Inc.*, 780 N.Y.S.2d 593, 596 (1st Dep't 2004); *see Dweck Law Firm, LLP v. Mann*, 727 N.Y.S.2d 58, 59-60 (1st Dep't 2001) ("[T]he client must plead specific factual allegations establishing that but for counsel's deficient representation, there would have been a more favorable outcome to the underlying matter.").  To have "prevailed" means in this context that Defendants' failure to ask for minority veto rights was the legal cause of Plaintiffs' failure to obtain those rights.  In essence, Plaintiffs would have Defendants be the guarantor of every right that they would have wanted Brammo to grant Plaintiffs but that, at the time, Brammo failed to grant.

Plaintiffs have failed to present any evidence that had Defendants only asked for minority veto rights, Brammo would have provided them.  Plaintiffs did, in fact, ask for approval rights from Brammo and Brammo declined to provide such rights.  After Krauss emailed on February 11, 2014 that EVIP needed an approval right, McDougall contacted Bramscher on the same day to express that Plaintiffs were "requesting (needing…) some sort of meaningful rights on terms of series E. right now we would have no say assuming Aviva is >$4.5m."  Dkt. No. 43-14.  In short, McDougall and Krauss understood that assuming Aviva was the majority holder of the Series D Preferred Stock that EVIP was also purchasing, EVIP would have "no say" in any decision Aviva made with respect to that class and therefore, EVIP asked for "meaningful rights" for itself.  Brammo responded that it would not be able to provide those "meaningful rights," Dkt. No. 43-15, i.e., that it would not be able to provide the approval rights EVIP was requesting,

---

would have prevailed in the underlying action"); *see also Rubens*, 527 F.3d at 255-56.  The result is the same under either type of causation.

*see* Dkt. No. 64-14 at 114:2-6.  In McDougall's words to Krauss, Brammo did not want to "move

on this." Dkt No. 64-43.  Brammo and the Joint Venture needed Aviva's involvement, Aviva

had become "a leading investor" and a prospect for making additional investments "in the

future," Dkt. No. 43-12, Aviva had not yet signed the agreement, and the Fifth Charter and

Series D Purchase Agreement conferred valuable rights on Aviva to agree to a refinancing or

recapitalization if that was in its best interests.  Plaintiffs have presented no evidence that

Brammo would have come to a different decision and would have conferred on EVIP the

valuable right to block Aviva from agreeing to a modification of the Series D Preferred Stock if

the request had come from Handel and Schnader Harrison rather than from McDougall.

### b.      Failure to Advise of Majority Consent Provision

Plaintiffs' second theory of legal malpractice, that Defendants failed to advise them of the

majority consent provision and its effects, also fails.  Plaintiffs did not advise Defendants at the

outset of their need for a minority veto right, Defendants did not misadvise Plaintiffs, before they

entered the transaction, of the effect or the meaning of the anti-dilution provisions or the effect of

the absence of a minority veto right, and Plaintiffs knew that the anti-dilution rights that they had

were qualified by the right of the majority holder of the Series D Preferred Stock to waive or

modify any of the rights or protections of that security.

The parties do not disagree, and there is no genuine disputed issue of fact, that there is a

difference between an anti-dilution provision and a minority consent right.  A full ratchet

anti-dilution provision protects the place of a preferred security in the capital structure of a

corporation and its relationship both to the common shares and to more senior equity securities

by preventing the issuer from creating or authorizing "the creation of any class of stock senior to

or *pari passu* with the class or series of stock being protected" or taking other such actions "that

would be adverse to the protected class." Dkt. No. 64-17 ¶ 30 (Plaintiffs' expert report).  Thus,

45

for example, if a company were to issue additional common shares at a price below the conversion price attached to a class of preferred securities, an anti-dilution provision might reduce the effective price to be paid by the holder of the preferred securities and increase the number of shares to be obtained upon conversion to compensate for the dilution of value of each additional common share.  Anti-dilution provisions attach to classes of preferred stock as a matter of right under a corporation's charter and not solely as a matter of contract with an individual shareholder.  They thus are transferrable as shares of preferred stock change hands.  *Compare id.* ¶¶ 22, 30, 42*, with* Dkt. No. 43-27 ¶¶ 15-16 (Defendants' expert report).

A majority consent provision, a minority veto, or any collective action provision is different.  A corporation is a living entity in need of financing for its operations.  The capital structure that is most efficient for it and most valuable for the owners of a class of preferred securities at its birth may no longer be in the best interests of its shareholders, including those who hold preferred securities, as it reaches adolescence.  It thus is common for a company to include in its charter a provision that permits the majority holder of a series of preferred stock to amend or waive the terms and conditions benefitting the holders of a class of a preferred stock holders, including any applicable anti-dilution provisions.  *Compare* Dkt. No. 43-27 ¶¶ 17, 55*, with* Dkt. No. 64-17 ¶¶ 32-33, 35*, and* Hr'g Tr. at 20:16-22.  Such a provision protects both the issuer corporation and the holders of the class of securities by permitting them to agree on revisions that will ensure the most efficient capital structure (and lowest cost of financing) going forward.  Moreover, from both the perspectives of the issuer corporation and of the preferred security holders as a class, a majority consent provision solves for the collective action problem by protecting against the risk that a minority will operate as a hold-out, attempting to extort value

for its consent in its own self-interest and not in the interest of the class as a whole.  *See* Dkt. No. 64-17 ¶¶ 31-32.

At the outset, Plaintiffs expressed a desire only that the preferred stock that they would be purchasing would have anti-dilution protection and not that they would be able to block any decisions by the class as a whole to agree in the future to a modification of those rights.  Thus, the entire discussion before the acquisition of the Better Place Assets in mid-November 2013 concerned what type of anti-dilution rights the preferred stock would enjoy—whether it would be full ratchet or a different type of protection called weighted average.  *See, e.g.*, Dkt. No. 66 at 4, 12, 14.  There was no discussion of whether Plaintiffs would want or would be able to get minority veto rights over and on top of the rights inhering in the class of securities itself.

The summary judgment record reflects that at least as early as December 2013, and before the December 2013 MOU, Brammo, EVIP, and Terracap began discussing that Brammo would need to issue additional securities, including preferred securities to finance the venture. *See, e.g.*, Dkt No. 43-10.  Even then, however, neither Krauss nor McDougall—who obviously were sufficiently knowledge about anti-dilution provisions to want such provisions and to know the difference between full ratchet and weighted average—expressed that they wanted or thought they would be able to get minority veto rights.  Importantly, they did not make Defendants aware that they wanted such rights.

 The summary judgment record reflects that by February 11, 2014—after the December 2013 MOU was agreed, after it became clear that Aviva would be the majority holder of the Series D Preferred Stock, and on the eve of final documentation of the transaction—Plaintiffs did express a concern about the rights that Aviva would have as against EVIP if EVIP did not have "some approval rights."  Krauss expressed that view to McDougall and Handel on February 11

itself.  *See* Dkt No. 43-13.  Importantly, however, there is no evidence in the record that Handel or Schnader Harrison misadvised McDougall or Krauss regarding the impact of Aviva having a majority position in the Series D Preferred Stock or the effect of the absence of "some approval rights."  To the contrary, the record shows that Defendants advised Plaintiffs that there was an economic cost to them of Aviva having a majority position and Plaintiffs not having approval rights, counseling that instead of asking for the ability to block Brammo from issuing a new class of securities, Plaintiffs ask for an option to swap into the new class.  *See* Dkt. No. 64-43.  That Plaintiffs failed to get that option (and even if Plaintiffs failed to ask for it) does not make Defendants liable in malpractice for failing to advise Plaintiffs properly of the impact of Aviva being the majority holder.[16]

There is no dispute that Plaintiffs knew that when EVIP signed the Joint Venture Agreement and the Series D Purchase Agreement that the majority holder of the Series D Preferred Stock would have the ability to agree to a waiver or modification of the rights of the Series D Preferred Stock and that EVIP would not have a minority veto right to block the majority holder from doing so if it believed it was in its best interests.  The majority consent

---

[16] Plaintiffs cite to cases for the proposition that courts have "upheld claims of legal malpractice, and summary judgment in favor of the client, where an attorney failed to advise a client of the legal significance of relevant transaction terms."  Dkt. No. 66 at 31-32; *see Hart v. Carro, Spanbock, Kaster & Cuiffo*, 620 N.Y.S.2d 847, 848-49 (2d Dep't 1995) ("[I]n improperly structuring the Stock Purchase Agreement and in failing to properly investigate, evaluate, and advise the plaintiffs as to the enforceability of the pledge agreement used to secure the [] collateral, [defendant] did not exercise that degree of skill commonly exercised by an ordinary member of the legal community."); *Stokes v. Lusker*, 2009 WL 612336, at *9 (S.D.N.Y. Mar. 4, 2009), *aff'd*, 425 F. App'x 18 (2d Cir. 2011) (adequately alleging legal malpractice on motion to dismiss when alleged counsel knew plaintiff wanted to buy property only if he could rent it and "[d]espite this knowledge," counsel "had plaintiff sign the contract without either obtaining or reviewing all of the necessary documents from the coop board and the sellers" that listed the commercial use restrictions in the property).  But in each of these cases, counsel failed to follow specific instructions from the client to include or negotiate such terms.  *See* Dkt. No. 71 at 10-11.

provision was transparent on the face of the Joint Venture Agreement. That agreement made clear, towards its very beginning, that EVIP would have only a minority interest in the Brammo Series D Preferred Stock and that the Series D Preferred Stock would enjoy only "the anti-dilution provisions and other rights applicable to the Brammo Series D Preferred Stock as set forth in the Brammo Articles." Dkt. No. 43-2 § 2.1. It did not provide for any special minority veto rights.

As much was also clear from the terms of the Fifth Charter to which the Joint Venture Agreement referred and which were incorporated by reference into the Joint Venture Agreement. The Fifth Charter, on its face and in plain English, provided that with the "consent or vote of the holders of a majority of the Series D Preferred Stock," Brammo could waive "any of the rights, powers, preferences and other terms of the Preferred Stock." Dkt. No. 43-3 § 8.

Finally, the same was clear from the Series D Purchase Agreement, which was signed by Brammo, EVIP, Aviva, and other investors. In addition to making obvious that Aviva would be the majority holder of the Series D Preferred Stock, the Series D Purchase Agreement contained the provision (which would have been important for Aviva) that the majority holder of the Series D Preferred Stock could agree to an amendment that would decrease the rights or obligations of the Series D Preferred Stock holders without the consent of EVIP.

These various agreements were signed by McDougall, who testified that he read them; there is no evidence that he did not understand what he was signing. *See, e.g.*, Dkt. No. 43-29 at 94:23-105:7; Dkt. No. 64-14 at 136:8-139:24.

Indeed, the contemporaneous evidence uniformly shows that both McDougall and Krauss understood the impact of Aviva being the majority holder and EVIP not having approval rights. On February 11, 2014, before he signed the Joint Venture Agreement, McDougall stated to

Krauss, "Next terms require approval of majority of Series D. If we are at 4.5 and Aviva (or others) are at 5 or 5.5 we would obviously not have majority. I will see where I can get to with Craig." Dkt. No. 43-13. Krauss responded, "We need some approval right. Aviva may have a conflict next time around," reflecting he and McDougall both knew that without an approval right, Brammo and Aviva would not need to go to EVIP for approval. *Id.*[17]

Two cases are directly on point. In *Preferred Fragrance*, plaintiffs were a perfume company and its principals and investors who retained the defendant law firm in connection with an anticipated asset sale to another party. 2015 WL 6143612, at *1. The asset purchase agreement contained a provision making the individuals jointly and severally liable for any inaccuracy or breach of any representation or warranty in the agreement. Two years after the transaction closed, the purchaser sued the individuals, alleging breaches by the perfume company of the asset purchase agreement, and the parties settled. Plaintiffs filed separate suit against their law firm, claiming that the law firm engaged in malpractice by failing to inform them about, and explain the consequences of, the individual liability provision in the asset purchase agreement that the individual plaintiffs themselves signed. Plaintiffs claimed that defendant was responsible for the fact that plaintiffs were jointly and severally liable—they claimed "they did not understand that by signing the [asset purchase agreement], they were exposing themselves to individual liability for breaches on the part of the company . . . or of other individual signatories" and had defendant explained the provision, they would not have signed the agreement. *Id.* at *5. Defendant responded that it did not have an obligation to explain the provision to their clients.

---

[17] Indeed, at oral argument, Plaintiffs' counsel stated that "once February 11 comes . . . [Krauss]'s informed that . . . there's a provision here and the way it reads is if Aviva ends up with 50 percent, they're going to be able to control this class. Well, at that point he's now informed of that." Hr'g Tr. at 23:2-5.

The provision was plain on the face of the agreement and "spoke for itself." *Id.* Plaintiffs could have asked defendant for the meaning of the provision if they had a question; in the absence of a question from plaintiffs, defendants had no "cognizable duty to do more." *Id.*

The court rejected plaintiffs' argument. The court held that, under New York law, "when the only allegation of legal malpractice is a failure to advise a plaintiff-client of the consequences of a contractual provision . . . there is no malpractice liability where 'the agreement reveal[s] on its face what the client claim[s] he was not told' because in such cases, the malpractice claim is 'flatly contradicted by documentary evidence.'" *Id.* at *6 (quoting *Diamond*, 468 F. Supp. 2d at 635). Even though plaintiffs claimed not to have understood the provision, there was no cognizable claim of malpractice because "the legal risk of the individual liability provision could not have been more plainly stated on the face of . . . the [asset purchase agreement]," and "although plaintiffs allege that they misunderstood the individual liability provision of the [asset purchase agreement], nowhere do they allege that it would have been unreasonable for defendant to recommend it if they had." *Id.* at *7. Such individual liability provisions "are common in closely held business transactions" and there was no allegation "that defendant knew, or had reason to know, that plaintiffs would balk at" the provision if defendant had highlighted it. *Id.* at *8. The court thus drew a distinction between, on the one hand, cases where either a client asked about a provision (or retained a lawyer to provide advice about a provision) and received incorrect advice or "where the negligence of an attorney is evinced by a substantive aspect of the document at issue," *id.* at *6, and on the other hand, cases where the client claimed, after the fact, that it had not understood a contractual provision at the time of the agreement, the effect of which later turned out to have an adverse impact on the client. The court stated that the latter would present "an allegation that is impossible to refute" by a defendant. *Id.* at *8. Moreover,

"it is one thing for a client to rely on his lawyer's incorrect advice that a contractual provision does not mean what it says; it is quite another to hold that a lawyer will be liable in malpractice for not explaining to a client what a plainly worded contractual provision does, in fact, say." *Id.* at *6.

The court demonstrated the dramatic practical impact of the "broad theory of malpractice liability that plaintiffs ask[ed it] to endorse." *Id.*  A rule allowing liability based on an attorney's "fail[ure] to proffer an unsolicited layman's explanation of [a known deal term] to their commercial clients" would be "unworkable, primarily for lack of a limiting principle, in the context of a commercial transaction." *Id.* at *8.  "Even if counsel to a deal participant were to sit at length with his commercial client, and to walk paragraph by paragraph through an agreement of this type, a client who becomes unhappy with a risk allocation that ends up going badly would always have the ability to bring his lawyer into litigation, without any colorable argument that a provision of the agreement was substantively unreasonable, nor any allegation of misinformation or justifiable reliance on the attorney, simply by alleging that he did not understand the risk because it was not 'adequately explained.'" *Id.*

In *Cobble Creek Consulting, Inc. v. Sichenzia Ross Friedman Ference LLP*, 973 N.Y.S.2d 595 (1st Dep't 2013), plaintiffs asked the defendant lawyer to ensure that a certificate of designation included a provision that would prevent the corporation from changing the common stock structure in a way that could affect the conversion rate of plaintiffs' Series A Preferred Stock, i.e., an anti-dilution provision.  Instead of changing the common stock structure, the corporation achieved the same result through a provision in the certificate that allowed a majority vote of Series A Preferred Stock holders to change the value of the Series A shares, "rendering plaintiffs' stock virtually worthless." *Id.* at 596.  The appellate division held that

plaintiffs failed to establish proximate cause for a malpractice claim because even if defendant failed to satisfy a standard of care in connection with the inclusion of the anti-dilution provision, "inclusion of the anti-dilution provision plaintiffs cite would not have altered the result." *Id.* The unstated premise was that defendant had no duty to do what plaintiffs did not request.

 *Preferred Fragrance* and *Cobble Creek* are each dispositive of Plaintiffs' claim. Plaintiffs do not dispute that the terms of the Series D Preferred Stock, including the majority consent provision, were plain on the face of the agreements EVIP signed.  The Joint Venture Agreement made explicit that the only anti-dilution protection EVIP was receiving was "set forth in the Brammo Articles," Dkt. No. 43-2 § 2.1, Plaintiffs had the Brammo Articles (i.e., the Fifth Charter) prior to signing the Joint Venture Agreement or Series D Purchase Agreement, *see, e.g.*, Dkt. No. 43-4, Ex. B; Dkt. No. 64-14 at 100:25-104:24, and the Fifth Charter stated that the majority could waive the protections on behalf of the Series D class as a whole.  The Series D Purchase Agreement clearly indicated that EVIP was not the majority holder of the Series D Preferred Stock and that there was a majority shareholder in place, Aviva, who could waive the protections of the Series D class as a whole and thus affect EVIP's anti-dilution provisions. Moreover, these terms were not some obscure provisions, tucked away in a corner of the agreement that EVIP would have no reason to believe were insignificant or to inquire about. Anti-dilution rights were "critical" to Plaintiffs and central to the consideration EVIP was receiving in the transaction.  Dkt. No. 66 at 1.  Nor have Plaintiffs presented evidence or argued that a majority consent provision was substantively unreasonable for a deal of this sort.  Their expert argues that, even though companies have agreed to other provisions and might have done so in this instance, majority consent provisions are common in contractual transactions.  *See* Dkt. No. 64-17 ¶ 35; *see also* Hr'g Tr. at 20:16-22.  In these circumstances, Defendants were not

required to assume that Plaintiffs lacked the knowledge of a reasonable person engaged in the transaction in which Plaintiffs were engaged, especially where the undisputed evidence shows Plaintiffs knew enough to distinguish between full ratchet anti-dilution rights and weighted average anti-dilution rights. *See, e.g.*, Dkt. No. 64-46. It was reasonable, as a matter of law, for Defendants to assume that if Plaintiffs had a question and did not understand such a central provision, Plaintiffs would have asked.

Moreover, just as in *Cobble Creek*, Defendants did ensure that the transaction documents included the anti-dilution provision requested by Plaintiffs. If the transaction documents did not contain a further minority veto provision that would have permitted EVIP to act as a hold-out and to protect its own individual interests, Plaintiffs never asked Defendants to demand such a provision of Brammo. Defendants therefore cannot be held accountable for any loss suffered by Plaintiffs by virtue of the transaction documents' failure to include such a provision. Plaintiffs have only a few responses, none of which is availing. Plaintiffs argue that the fact that they entered into the Joint Venture Agreement "is not a complete defense to professional malpractice claims." *Stokes*, 2009 WL 612336, at *10; *see also* Dkt. No. 66 at 31-32 ("The fact that plaintiff signed, and is thus bound by, the terms of this agreement does not preclude an action for malpractice against the attorney who assisted in drafting it.") (quoting *Escape Airports (USA), Inc. v Kent, Beatty & Gordon, LLP*, 913 N.Y.S.2d 47, 49 (1st Dep't 2010)). But it is not the fact that Plaintiffs signed the Joint Venture agreements that is alone the defense. It is that there is no evidence that Defendants misadvised Plaintiffs of the meaning or consequences of a business term in the agreements that Plaintiffs knowingly read and signed—and that were not unreasonable on their face—that provides the defense.

Plaintiffs also argue, relying on a declaration from Krauss, that Krauss was unaware of the effect of the majority vote provision and the limitation of the anti-dilution provision. Krauss's declaration states, after the fact and in carefully crafted language, that he was "unaware at the time of the particular terms and provisions of the transaction documents," Dkt. No. 62 ¶ 9, and the fact that anti-dilution protection could be altered or eliminated by any other party without his consent "was a concept that I was unaware at the time was even legally possible," *id.* ¶ 15. Such "unsupported allegations do not create a material issue of fact" for numerous reasons. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

In the first instance, that Krauss was unaware of the particular terms and provisions of the transaction documents and that he was not aware the anti-dilution protection "could be altered or eliminated" is not necessarily inconsistent with the evidence that he was generally aware of Aviva's rights as majority holder of the Series D Preferred Stock, including that the majority holder could decide on behalf of the class not to enforce but to waive those rights—in exchange for consideration from Brammo.

Second, as a matter of summary judgment law, such after-the-fact conclusory assertions are not sufficient to raise a genuine issue of fact particularly when they are contradicted by the record and the contemporaneous evidence. *See In re M/V MSC FLAMINIA*, 229 F. Supp. 3d 213, 219 (S.D.N.Y. 2017) ("The Court should not accept evidence presented by the nonmoving party that is so 'blatantly contradicted by the record . . . that no reasonable jury could believe it[.]'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")); *Deebs v. Alsom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir.

2009) (plaintiff's self-serving testimony, contradicted by "the hard evidence adduced during discovery," could not raise genuine issue of material fact).  As reflected above, all of the contemporaneous evidence demonstrates that Krauss was knowledgeable that if Aviva was the majority holder—and if EVIP did not have a minority veto right—Aviva would be able to agree to changes in the rights of the Series D Preferred Stock without obtaining EVIP's consent. Krauss was the one who stated that EVIP needed "approval rights."

Third, the question of Krauss's knowledge is something of a red herring.  Krauss is not the plaintiff here; EVIP and Terracap are.  The record furthermore establishes that EVIP and Terracap endowed McDougall with an agency with respect to the Joint Venture Agreement and the related documents that he negotiated.  Thus, McDougall's knowledge is imputed to EVIP and Terracap.  *See Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 689 (2d Cir. 1983) (A "principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never have been communicated to the principal") (quoting *Farr v. Newman*, 199 N.E.2d 369, 371 (N.Y. 1964)); *see also Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999) ("[W]hen an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal.") (citing Restatement (Second) of Agency §§ 9(3), 268, 272, 275 (1958)).  In short, Defendants were not required to assume that what was known to McDougall was unknown to Krauss, EVIP, or Terracap.  And there is no evidence that McDougall was unaware of the terms of the agreements he signed.[18]

---

[18] The only evidence Plaintiffs' counsel identified at oral argument to suggest there is a genuine disputed issue of fact that McDougall did not understand the implications of the majority vote provision and the fact that Aviva was in the majority was an after-the-fact July 30, 2015 email exchange between Krauss and McDougall.  *See* Hr'g Tr. at 17:11-18:8.  After Krauss sought to blame McDougall for the fact that the common stock did not have independent anti-dilution

Fourth, for reasons *Preferred Fragrance* makes clear, the understanding or lack of understanding of Krauss, or indeed of EVIP, cannot create a material issue of fact.  A contrary rule would create an obligation for "counsel to a deal participant . . . to sit at length with his commercial client, and to walk paragraph by paragraph through an agreement of this type."  At *8.

Finally, Defendants rely on the series of emails from March and July 2015, after the Series R recapitalization, in which Handel states his "personal opinion" that Brammo breached the Joint Venture Agreement by converting Plaintiffs' Series D Preferred Stock without their consent, *see* Dkt. Nos. 64-26, 64-56, to argue that Defendants failed to advise Plaintiffs on the majority consent provision because they misinterpreted the Joint Venture Agreement and Delaware law.  But Plaintiffs put more weight on those documents than they can bear.  The

protection and asked whether Handel was made aware of that fact (claiming that Krauss himself "never read the agreements or reviewed them"), McDougall responded, "Larry this i[s] unfortunate to hear and utter nonsense.  I can only assume things have gone sideways and you are falling out with Brammo and have somehow lost your D shares (which is shocking).  If you are looking for someone to pin it on, look elsewhere."  Dkt. No. 64-109.  This email, in which McDougall in July 2015—17 months after the execution of the Joint Venture Agreement and 10 months after McDougall left Terracap's employ—expresses "shock" that EVIP lost its "D shares," however, cannot as an evidentiary matter establish that McDougall would have been shocked or not known in February 2014 that Aviva as majority holder would have had the power to alter the rights of the Series D Preferred Stock.  *See* Fed. R. Evid. 803(1) (stating that a "statement describing . . . an event or condition" is hearsay unless if "made while or immediately after the declarant perceived it"); Fed. R. Evid. 803(3) (excited utterances admissible as evidence of "declarant's then-existing state of mind" and not as hearsay evidence of state of mind at earlier time).  Plaintiffs also cannot create a genuine issue of material fact based on McDougall's testimony that stated Handel told him that he could sign the Joint Venture Agreement.  Hr'g Tr. at 18:19-19:20; Dkt. No. 64-14 at 213:1-216:11 (testimony); *see also* Dkt. No. 64-49 (email from McDougall to a third-party, "[M]y lawyer said fuck it and send docs.").  That conversation post-dated McDougall's knowledge of the impact of the absence of a minority veto provision and does not reflect any advice regarding that or the anti-dilution provision.  What is conspicuous is the absence of any contemporaneous evidence of McDougall's lack of knowledge or misunderstanding of the minority consent provision and any declaration or deposition testimony from McDougall stating that at the time he did not understand the provisions.

documents themselves do not reflect that Handel misunderstood the Joint Venture Agreement or related agreements.  He accurately informed Krauss of the implications of those documents—Brammo's "charter permits them to amend the rights of the preferred holders if a majority of the class approves."  Dkt. No. 64-51.  From the documents, that particular point was not a surprise to Krauss, who responded with a misunderstanding about the impact of the recapitalization not on EVIP's Series D Preferred Stock but rather of its ripple effect on EVIP's right to the number of common shares it would receive under the Joint Venture Agreement.  The language to which Plaintiffs refer and upon which they base their argument comes not in the private correspondence with Plaintiffs but in the later negotiating position that Handel took with Brammo—in attempting to convince Brammo to agree to provide some further consideration to EVIP.  Plaintiffs have presented no evidence that the letter reflected anything other than a negotiating posture.

In any event, even if in March 2015 Handel was under a misunderstanding of EVIP's rights under the Joint Venture Agreement or under Delaware corporate law, that would not make him or Schnader Harrison liable for advice and representation they provided to Plaintiffs when Plaintiffs decided in February 2014 to sign the Joint Venture Agreement and related documents. Those later documents do not refer to advice given in the pre-February 2014 time period or communications made by Defendants in that earlier period.  They thus cannot contradict or create a genuine issue of material fact with respect to the events and communications in that earlier period, including that McDougall, at least, understood the terms of the agreements when he signed them.

### B.    Delivery of Shares in Escrow

Plaintiffs are also unsuccessful on their claim that Defendants breached a duty of care by failing to ensure that Brammo would deliver the 10 million shares provided for in the Joint Venture Agreement.  Plaintiffs allege that Defendants were aware Plaintiffs were to receive 10

million common stock shares in escrow—5 million at the time of execution of the Joint Venture

Agreement and 5 million after Terracap completed transfer of the intellectual property rights

relating to the Better Place Assets—but that "Defendants never advised Terracap that because

Brammo had not delivered the first 5 million shares of common stock, they should not release

their money or signature pages."  Dkt. No. 66 at 23.

On February 7, 2014, Plaintiffs sent Handel a letter that stated: "As you know, Terracap

is in the process of negotiating a transaction with Brammo, Inc.  In connection with the

negotiations, we will be wiring to you today funds in the amount of $500,000 which you are

hereby instructed to hold in escrow.  At the appropriate time, we will provide you with

authorization in writing to release such funds pursuant to . . . which Three Million dollars is

being held."  Dkt. No. 64-58.  That letter did not indicate who would determine the "appropriate

time," but on February 11, 2014—before the Joint Venture Agreement—McDougall emailed

Handel "authorization to wire $500,000."  Dkt. No. 72-3.  By this time, Plaintiffs had possession

of the $3.5 million that they would eventually pay to Brammo as part of the Joint Venture.

The day before the signing of the Joint Venture Agreement, on February 13, 2013,

Plaintiffs informed Handel they had learned that the escrow agreement in connection with the

Joint Venture would not be finalized until 2-4 days later and asked whether they needed to have

the escrow in place at closing.  *See* Dkt. No. 43-16.  Handel advised McDougall that Plaintiffs

should wait to have the escrow agreement in place and the 5 million shares delivered before

signing the Joint Venture Agreement and paying the $3.5 million.  Dkt. No. 43-16 ("I think it has

to be in place and the shares from Brammo and B-Con delivered at the time of signing the JV

agreement; a good reason for doing it next week; we aren't in a rush are we?; I think we agree

today that there are to be no further changes to the JV agreement (after our requests are handled)

and 'close' as soon as we can.").  Despite Handel's advice, Plaintiffs signed the Joint Venture

Agreement and delivered the $3.5 million to Brammo without first receiving the shares.  *Id.*  "As

a logical matter, if [plaintiff] refused to follow defendants' advice at any time, then [plaintiff]

obviously could not claim that defendants were responsible for any damages it incurred as a

result of refusing to follow the advice."  *Windsor Sec., LLC v. Arent Fox LLP*, 273 F. Supp. 3d

512, 523 (S.D.N.Y. 2017); *see Town of N. Hempstead v. Winston & Strawn, LLP*, 814 N.Y.S.2d

237, 240 (2d Dep't 2006) ("Where, as here, a sophisticated client imposes a strategic decision on

counsel, the client's action absolves the attorney from liability for malpractice.").

In addition, Plaintiffs have not established damages on this claim.  The $720,676

valuation of Plaintiffs' shares by Cummins includes payment for the 10 million shares.  Plaintiffs

have not demonstrated how they suffered damages resulting from non-delivery of the shares into

escrow at the time of closing separate and apart from the amount they will receive (or have

already received) from Brammo (by way of Cummin's buyout) for those shares.  They do not

allege that they would have sold the shares or taken any other action for those shares before the

buyout by Cummins.

## II.     Breach of Contract

"A claim for breach of contract is properly dismissed as 'redundant . . . of a malpractice

claim,' where it is does not 'rest upon a promise of a particular or assured result,' but rather upon

defendant's alleged breach of professional standards."  *Diamond*, 468 F. Supp. 2d at 640

(quoting *Senise v. Mackasek*, 642 N.Y.S.2d 241, 242 (1st Dep't 1996)); *see Indus. Quick Search,*

*Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *17 (S.D.N.Y. Jan. 2, 2018) (where

plaintiff alleges "a 'breach of general professional standards' and not a breach of a particular

action or promised result, then the breach of contract claim is duplicative of the legal malpractice

claim and viewed as a redundant pleading") (quoting *PPX Enters., Inc. v. Fredericks*, 5 F. App'x
25, 28 (2d Cir. 2001)).

Plaintiffs' breach of contract claim is based on Defendants "repeated[] fail[ure] to meet
the standard of care required and expected by Plaintiffs in the discharge of their duties," namely,
by failing to "properly and competently represent Plaintiffs' interests in connection with the
transactions . . . and at all times to exercise the utmost care."  Compl. ¶¶ 64, 67.  The parties did
not enter into an engagement letter, but they do not dispute that Defendants were hired to work
on the Joint Venture transaction.  As discussed, that representation did not contain a guarantee by
Defendants for a "particular action or promised result," and therefore is duplicative of the legal
malpractice claim.  *Indus. Quick Search*, 2018 WL 264111, at *17; *see Senise*, 642 N.Y.S.2d at
242 (affirming dismissal of breach of contract claim because "the cause of action, as pleaded, did
not rest upon a promise of a particular or assured result [but] only claimed a breach of general
professional standards, which is viewed as a redundant pleading of a malpractice claim")
(internal citations and quotation marks omitted); *see also Nordwind v. Rowland*, 584 F.3d 420,
434 (2d Cir. 2009) (dismissing breach of fiduciary duty as duplicative because it arose from the
same factual events and sought identical relief).

The breach of contract claim is thus dismissed as duplicative.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.  Dkt. No. 40.  The *Daubert* motions are DENIED as MOOT.  Dkt. Nos. 45, 51.

The Clerk of Court is respectfully directed to close Dkt. Nos. 40, 45, 51 and to close the case.

SO ORDERED.

Dated: March 15, 2021
       New York, New York

_____
                LEWIS J. LIMAN
          United States District Judge